*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0223p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

JEFFREY MICHAEL MOLDOWAN,
         *Plaintiff-Appellee,*

         *v.*

CITY OF WARREN, DONALD INGLES, MICHAEL
SCHULTZ (07-2115); ALAN WARNICK
(07-2116); MAUREEN FOURNIER (07-2117),
         *Defendants-Appellants.*

Nos. 07-2115/2116/2117

>

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 05-70331—Anna Diggs Taylor, District Judge.

Argued: January 20, 2009

Decided and Filed: July 1, 2009

Before: MOORE, CLAY, and KETHLEDGE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Rosalind Rochkind, GARAN LUCOW MILLER, P.C., Detroit, Michigan, Brian J. Richtarcik, CHAPMAN & ASSOCIATES, P.C., Bloomfield Hills, Michigan, Sarah R. Prout, LAKESHORE LEGAL AID, Port Huron, Michigan, for Appellants. Michael R. Dezsi, FIEGER, FIEGER, KENNEY, JOHNSON & GIROUX, Southfield, Michigan, for Appellee. **ON BRIEF:** Rosalind Rochkind, Jami E. Leach, GARAN LUCOW MILLER, P.C., Detroit, Michigan, Brian J. Richtarcik, Ronald W. Chapman, CHAPMAN & ASSOCIATES, P.C., Bloomfield Hills, Michigan, Sarah R. Prout, William R. Knight, LAKESHORE LEGAL AID, Clinton Township, Michigan, for Appellants. Marc M. Susselman, Dennis A. Dettmer, Detroit, Michigan, for Appellee.

     CLAY, J., delivered the opinion of the court, in which MOORE, J., joined. KETHLEDGE, J. (pp. 60-69), delivered a separate opinion concurring in the judgment in part and dissenting in part.

———————————

**OPINION**

———————————

CLAY, Circuit Judge.  In this action, Plaintiff Jeffrey Moldowan ("Moldowan") asserts a number of claims under 42 U.S.C. § 1983 alleging violations of his rights under the Fourth, Fifth, Sixth and Fourteenth Amendments, as well as claims under Michigan state law.  Moldowan's claims arise out of his arrest, criminal prosecution, conviction, and retrial for the 1990 abduction and brutal sexual assault of Maureen Fournier ("Fournier").  After new evidence came to light and a key prosecution witness recanted her testimony, the Michigan Supreme Court reversed Moldowan's conviction in 2002.  *People v. Moldowan*, 643 N.W.2d 570 (Mich. 2002).  On retrial, in February 2003, Moldowan was acquitted of all charges and released, having served nearly twelve years in prison.

After his release, Moldowan filed the instant civil action asserting various claims against the City of Warren, the Warren Police Department, Macomb County, the Macomb County Prosecutor in his official capacity, Dr. Alan Warwick, Warren Police Detective Donald Ingles, Warren Police Officer Mark Christian, and Fournier.  Moldowan subsequently amended his complaint to assert claims against Warren Police Officer Michael Schultz.  Broadly speaking, Moldowan alleges that the Defendants—both acting separately and conspiring together—violated his civil rights by fabricating evidence against him, failing to disclose exculpatory evidence, and pursuing his prosecution and retrial without probable cause.

After discovery, the Defendants moved for summary judgment on all thirty-six counts asserted in Moldowan's Third Amended Complaint raising various immunity defenses.  After dismissing certain counts against Detective Ingles, the City of Warren, and the Warren Police Department, and dismissing all counts against Officer Christian, the district court denied Defendants' motions for summary judgment in all other respects. These three interlocutory appeals followed.  For the reasons set forth herein, we **AFFIRM IN PART** and **REVERSE IN PART** the judgment of the district court.

**I.**

Moldowan's Third Amended Complaint asserts thirty-six claims against nine county, municipal, and individual defendants. All claims arise out of Moldowan's arrest, criminal prosecution, conviction, and retrial for the abduction and assault of Maureen Fournier.

**A.   Factual Background**

On the morning of August 9, 1990, Emergency Medical Service ("EMS") found Fournier badly injured and lying in the street in the City of Detroit. EMS transported Fournier to St. John's Hospital. The medical forms completed on her admission to the hospital, as well as subsequent medical reports and testimony from her doctors, bear witness to the extreme brutality of the crime. The police determined that Fournier had been abducted from the City of Warren, brutally assaulted and raped, and left on a street in Detroit.

Because Fournier had been abducted from Warren, the matter was turned over to the Warren Police Department ("Department"), and the case was assigned to Detective Ingles. Given the extent of Fournier's injuries, officers had to wait two days before they could interview her regarding the attack. Even then, the extent of Fournier's injuries forced Detective Ingles to write questions on a board, and Fournier responded in kind.[1] During the interview, Fournier reported that she had been abducted from Warren on the night of August 8, 1990 by four Caucasian males, all of whom she knew. Fournier stated that, while she was walking down the street, she was approached by Moldowan, who was her ex-boyfriend, thrown into a white or light-colored van, and brutally beaten and raped by three of the four assailants. Fournier identified her attackers as Michael Cristini, Jim Cristini, Tracy Tapp ("Tapp"), and Moldowan. Fournier's sister, Colleen Corcoran ("Corcoran"), confirmed Fournier's claims that Moldowan previously had assaulted and threatened Fournier.

After completing their investigation, the police arrested and charged all four individuals. The police subsequently dropped the charges against Tapp based on his alibi that he had been in Texas for several days prior to the assault, had not returned to

---

[1]Detective Ingles subsequently transcribed Fournier's responses to a witness statement form, which she later signed.

the Michigan until the evening of August 8, and spent the rest of the night with his girlfriend. Tapp's girlfriend confirmed his alibi.

On September 17-18, 1990, the Macomb County Circuit Court held a preliminary examination to determine whether sufficient evidence existed to proceed to trial. During that hearing, Fournier testified that, prior to the assault, she had dated and lived with Moldowan for more than a year before their relationship ended when he was arrested for assaulting her. Fournier and her sister both testified that, prior to the attack, Moldowan had been abusive toward Fournier and threatened her. In describing the assault, Fournier testified that she had been walking on 11 Mile Road in Warren when a van pulled alongside her. Fournier testified that Moldowan got out of the van, grabbed her, and dragged her into the van, where she was beaten and raped. As a result of the assault, Fournier suffered significant injuries that required extensive abdominal surgery.

Corcoran also testified at the hearing, stating that she received a call from an unidentified male on August 9, 1990, the day Fournier was found in Detroit, inquiring as to Fournier's whereabouts. Corcoran claims that she immediately recognized the caller as Moldowan. Corcoran testified that, although she knew that her sister was in the hospital, she lied and told Moldowan that her sister was at home with her, and that Moldowan then exclaimed: "No, she's not. . . . She's at the morgue." (J.A. 839.) Corcoran also testified that Moldowan had called her home the previous day looking for Fournier, and that Moldowan had stated that "he was going to get her." (J.A. 841-42.)

At the conclusion of the examination, the court dismissed Jim Cristini as a defendant, but bound over Moldowan and Michael Cristini on all counts. A jury trial was held from April 30 to May 10, 1991, during which Fournier and Corcoran offered substantially the same testimony they provided during the preliminary examination. Fournier also testified that she had never been in the Detroit neighborhood where EMS found her, and that she had never frequented a crack house in the area.

In addition, Dr. Alan Warwick, D.D.S., a forensic odontologist and consultant for the Wayne County Medical Examiner's Office and a consultant to Macomb County, Monroe County, and the Michigan State Police, offered expert testimony that bite marks

on Fournier's neck were consistent with dental impressions taken from Moldowan, and that bite marks on Fournier's right arm and right side were consistent with Michael Cristini's dentition. In describing his conclusions, Dr. Warnick testified that the "chances are . . . 2.1 billion to 1 that another individual can make those same marks." (J.A. 2544.)

In presenting their defense, Cristini and Moldowan offered alibi witnesses who testified that the defendants were not together on the evening in question. The defense also introduced pizza delivery tickets which documented the location of the pizza deliveries Cristini had made the night of August 8, 1990, seeking to show that Cristini could not have been part of the kidnaping. The defense also presented testimony from a witness who claimed that she observed several males in the street where Fournier was found, and that the males were both Caucasian and African-American. The defense also offered expert testimony from its own forensic odontologists countering Dr. Warnick's testimony concerning the bite-mark evidence.

On rebuttal, the prosecution called Dr. Pamela Hammel, D.D.S., a colleague of Dr. Warnick, who offered testimony corroborating and supporting Dr. Warnick's conclusions.

On May 10, 1991, the jury convicted Moldowan and Cristini of kidnaping, assault with intent to commit murder, and two counts of criminal sexual conduct in the first degree. After sentencing, the court entered an order requiring that "[a]ll evidence in the custody of the Warren Police Department, the Macomb County Prosecutor's Office and the Macomb County Circuit Court[,] whether admitted into evidence or not . . . [,] be preserved from this date forward until further order of the Circuit Court, Michigan Court of Appeals, or Michigan Supreme Court." (J.A. 2613.)

After trial, a private investigator hired by Moldowan's family located a witness, Jerry Burroughs, who reported that, on the morning of August 9, 1990, he saw four African-American males standing around a naked white female who was lying in the street, and that he saw the four men leave in a light-colored van. Burroughs further recounted that, approximately one week after the assault, he overheard two of those same

men talking about the incident and bragging that they had participated in the assault. Burroughs also indicated that he had seen Fournier in that neighborhood several times that summer frequenting a crack house in the area.

In addition to this new evidence, Dr. Hammel, after being approached several years later by Moldowan's appellate counsel, also recanted her testimony. Dr. Hammel explained that she initially had trouble matching the defendants' dentitions to the bite marks on Fournier's body, but that Dr. Warnick had reassured her that Dr. Norman Sperber, a highly respected forensic odontologist, had reviewed the evidence and confirmed Dr. Warnick's conclusions. After subsequently determining that Dr. Sperber had never reviewed any evidence in the case, Dr. Hammel surmised that Dr. Warnick "had been deceptive in order to mislead [her] into testifying in support of his conclusions."[2] (J.A. 2568.) In a sworn affidavit, Dr. Hammel stated that, had she known that Dr. Warnick's representation that Dr. Sperber had reviewed the evidence was untrue, she "would never have agreed to testify as a rebuttal witness in support of Dr. Warnick's conclusions." (J.A. 2568.)

On the basis of this new evidence and discredited testimony, Moldowan again sought review of his conviction. The Michigan Supreme Court eventually reversed Moldowan's conviction, and remanded the matter for a new trial. In particular, the Michigan Supreme Court found that "the prosecutor's two expert witnesses with respect to 'bite-mark' evidence have either recanted testimony which concluded that bite marks on the victim were made by the defendant or presented opinion evidence which has now been discredited." *Moldowan*, 643 N.W.2d at 570. The court also noted that the prosecutor conceded that "it simply is not fair to say that the defendant or defendant's counsel should have known about the problems with the bite-mark evidence prior to trial. The same can also be said with regard to the later-discovered alibi witnesses. . . . Without the bite-mark evidence and with the additional alibi witnesses, the result of the trial could have been different." *Id.* at 571.

---

[2]Dr. Warnick disputes Dr. Hammel's claims and denies that he ever told Dr. Hammel that he had consulted with Dr. Sperber. Dr. Warnick also denies that Dr. Hammel ever expressed any doubt about her conclusions prior to Moldowan's 1991 trial.

On retrial, in February 2003, Moldowan was acquitted of all charges and released. All told, Moldowan spent nearly twelve years in prison.

### B.  Procedural History of the Instant Action

On January 28, 2005, Moldowan brought this civil action asserting numerous claims under 42 U.S.C. § 1983 and Michigan state law. Moldowan ultimately filed three amended complaints. In resolving an earlier motion regarding discovery, the district court offered the following summary of the claims asserted by Moldowan in his Third Amended Complaint, the operative pleading at this juncture:

> Plaintiff's current complaint (Third Amended Complaint filed February 9, 2006) alleges a total of 36 counts against several groups of defendants: City of Warren; Police Department of City of Warren (WPD); County of Macomb and its Prosecutor in his official capacity; and sued in their individual and official capacities: Alan Warnick [forensic consultant], Donald Ingles [WPD detective], Mark Christian [WPD detective], Michael Schultz [WPD sergeant in charge of the evidence room], and "other Present and Former Members of the Warren Police Department and office of the Macomb County Prosecutor as yet unidentified," and sued individually: Maureen Fournier [the crime victim]. The case currently exceeds 200 docket entries with numerous . . . discovery disputes and appeals. Extensive discovery has been conducted—lengthy depositions taken and numerous interrogatories and requests to produce exchanged.

> The complaint alleges federal violations of plaintiff's civil and constitutional rights during his criminal prosecution, as well as state claims including intentional infliction of emotional distress against Ms. Fournier for her conduct in the second prosecution. Relevant to the instant motion are plaintiff's claims against the City of Warren and the Warren Police Department. With respect to these defendants, plaintiff alleges a conspiracy between Warnick and members of the Warren Police (Counts V, VI, VII, VIII), and conspiracy between Ms. Fournier and members of the Warren Police Department (Counts XVI, XVII, XVIII, XIX). Plaintiff also contends that there is liability on the part of the City of Warren and Warren Police Department for inadequate training and/or supervising of police officers regarding the constitutional rights of citizens (Count XXIV), and for the actions of defendant Ingles as the final policymaker in conducting the investigation (Count XXV). Additionally, plaintiff claims liability against the City of Warren and the Warren Police Department for the destruction of evidence in violation of

> a court order. He also claims that the Warren Police Department and the City of Warren are liable, along with Macomb County and its prosecutor, for the continued seizure and prosecution of plaintiff without probable cause in the second trial in violation of his constitutional rights under the Fourth Amendment (Count XXVII), and his rights to substantive due process under the Fourteenth Amendment (Count XXVIII), and his rights to procedural due process under the Fourteenth Amendment (Count XXIX). He also has a state claim for false imprisonment in connection with the second prosecution (Count XXXV).

*Moldowan v. City of Warren*, No. 05-CV-70331, 2006 U.S. Dist. LEXIS 82161, at *7-10 (E.D. Mich. Oct. 31, 2006) (alterations in original).

After extensive discovery, Defendants filed motions for summary judgment, asserting various qualified and absolute immunity defenses. Moldowan opposed those motions and cross-moved for partial summary judgment. Based on concessions made by Moldowan in his response to Defendants' motions, the district court dismissed Counts XXV, XXVII, XXVIII, and XXIX as to the City of Warren and the Warren Police Department, dismissed all claims against Officer Christian, and dismissed Count XXXII against Detective Ingles.

After receiving briefing from all parties and hearing argument on the matter, the district court denied Defendants' motions as to all remaining claims. The district court denied the County's motion on the grounds that "[t]he filing is appropriate against the County as a matter of law and certainly there are many questions of material fact for a jury to determine." (J.A. 3041.) As to the Warren Defendants' motion, the district court concluded that "[t]here are far too many questions of fact here." (J.A. 3020.) As to Dr. Warnick's motion, the court concluded that the motion "has to be denied" because "[t]here are too many facts at issue here even as to qualified immunity to grant summary judgment." (J.A. 3065.) As to Fournier's motion, the court concluded that "[t]here are innumerable issues of fact here, particularly as to simply whether Fournier lied or not. And the Court will instruct . . . that this was an intentional infliction or the jury is to decide whether there was an intentional infliction of emotional distress. I do find that the elements have been met." (J.A. 3090-91.) The court also denied Moldowan's motion for partial summary judgment.

The district court subsequently entered three written orders stating merely that Defendants' motions for summary judgment were "denied for the reasons stated on the record." (J.A. 323, 326, 328.)  The district court's written order as to the Warren Defendants' motion also dismissed "all claims against the City of Warren Police Department . . . for the reason that the City of Warren Police Department is not a legal entity capable of being sued." (J.A. 326.)

These three interlocutory appeals followed.

## II.

Before turning to the merits of Defendants' appeals, we first must determine whether and to what extent we have jurisdiction to consider on interlocutory appeal the issues raised by the parties.  On December 3, 2007, Moldowan moved this Court to dismiss each of the three interlocutory appeals, arguing that the trial court's orders do not constitute final orders appealable under 28 U.S.C. § 1291 and are not appealable under the collateral order doctrine.  By order dated March 27, 2008, a prior panel of this Court referred Moldowan's motions to this panel for resolution.  Upon consideration, we hereby deny Moldowan's motions.

### A.  Jurisdiction under the Collateral Order Doctrine

Although 28 U.S.C. § 1291 vests this Court with jurisdiction over appeals only from "final decisions" of the district courts, "a decision 'final' within the meaning of § 1291 does not necessarily mean the last order possible to be made in a case." *Gillespie v. United States Steel Corp.*, 379 U.S. 148, 152 (1964).  A decision also is appealable if it falls within "that small class [of orders] which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949).  That "small class" of decisions is limited to orders granting or denying a claim that "cannot be effectively vindicated after the trial has occurred." *Mitchell v. Forsyth*, 472 U.S. 511, 525 (1985).

The requirements for bringing an appeal under *Cohen*'s collateral order doctrine "have been distilled down to three conditions:  that an order '[1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] be effectively unreviewable on appeal from a final judgment.'" *Will v. Hallock*, 546 U.S. 345, 349 (2006) (quoting *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144 (1993)).  In *Johnson v. Jones*, 515 U.S. 304 (1995), the Supreme Court clarified these elements as follows:

> The requirement that the issue underlying the order be "effectively unreviewable" later on, for example, means that failure to review immediately may well cause significant harm.  The requirement that the district court's order "conclusively determine" the question means that appellate review is likely needed to avoid that harm.  The requirement that the matter be separate from the merits of the action itself means that review *now* is less likely to force the appellate court to consider approximately the same (or a very similar) matter more than once, and also seems less likely to delay trial court proceedings (for, if the matter is truly collateral, those proceedings might continue while the appeal is pending).

*Id.* at 311 (citations omitted) (emphasis in original).  The Court also has noted that "some particular value of a high order" must be "marshaled in support of the interest in avoiding trial."  *Will*, 546 U.S. at 352.  Thus, to take advantage of the collateral order doctrine, a party pursuing an interlocutory appeal must satisfy these three basic elements, as well as demonstrate that the challenged order "'imperil[s] a substantial public interest.'"  *Kelly v. Great Seneca Fin. Corp.*, 447 F.3d 944, 948 (6th Cir. 2006) (quoting *Will*, 546 U.S. at 353).

### B.  Jurisdiction in the Context of Immunity Claims

Whether we have jurisdiction to consider an issue on interlocutory appeal thus requires us to consider the three basic elements as well as whether the denial of summary judgment implicates "substantial public interests."   In this case, that requires us to consider the interests implicated by the district court's denial of Defendants' qualified and absolute immunity claims in the context in which those defenses have been asserted.

### 1. Defendants' Qualified Immunity Claims

Generally speaking, the rationale underlying the qualified immunity doctrine is that, "where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken 'with independence and without fear of consequences.'" *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982) (quoting *Pierson v. Ray*, 386 U.S. 547, 554 (1967)). "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery." *Mitchell*, 472 U.S. at 526. Like absolute immunity, the qualified immunity privilege entitles a party to "*immunity from suit* rather than a mere defense to liability," and thus "is effectively lost if a case is erroneously permitted to go to trial." *Id.* (emphasis in original).

In light of these interests, the Supreme Court has concluded that the denial of a defendant's assertion of qualified immunity "easily meets" the *Cohen* requirements:

> Such a decision is "conclusive" in either of two respects. In some cases, it may represent the trial court's conclusion that even if the facts are as asserted by the defendant, the defendant's actions violated clearly established law and are therefore not within the scope of the qualified immunity. In such a case, there will be nothing in the subsequent course of the proceedings in the district court that can alter the court's conclusion that the defendant is not immune. Alternatively, the trial judge may rule only that if the facts are as asserted by the plaintiff, the defendant is not immune. At trial, the plaintiff may not succeed in proving his version of the facts, and the defendant may thus escape liability. Even so, the court's denial of summary judgment finally and conclusively determines the defendant's claim of right not to stand trial on the plaintiff's allegations, and because "[there] are simply no further steps that can be taken in the District Court to avoid the trial the defendant maintains is barred," it is apparent that "*Cohen*'s threshold requirement of a fully consummated decision is satisfied" in such a case. *Abney v. United States*, 431 U.S. 651, 659 (1977).

*Mitchell*, 472 U.S. at 527. Thus, pursuant to *Mitchell*, "federal appellate courts have jurisdiction to hear interlocutory appeals considering 'the legal question of qualified immunity, *i.e.*, whether a given set of facts violates clearly established law.'" *Farm*

*Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 531 (6th Cir. 2002) (quoting *Mattox v. City of Forest Park*, 183 F.3d 515, 519 (6th Cir. 1999)); *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996).

In considering the denial of a defendant's claim of qualified immunity, however, our jurisdiction is limited to resolving pure questions of law. *See Mitchell*, 472 U.S. at 530 (addressing denial of a claim of qualified immunity, but only "to the extent that it turns on an issue of law"). We lack jurisdiction to consider "a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson*, 515 U.S. at 313; *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998) ("A defendant who is denied qualified immunity may file an interlocutory appeal with this Court only if that appeal involves the abstract or pure legal issue of whether the facts alleged by the plaintiff constitute a violation of clearly established law."). In light of this jurisdictional limitation, "a district court's determination that there exists a triable issue of fact cannot be appealed on an interlocutory basis, even when the finding arises in the context of an assertion of qualified immunity." *Gregory v. City of Louisville*, 444 F.3d 725, 742 (6th Cir. 2006). To permit an appeal in such circumstances "would interject appellate review into a district court's determination that the evidence is sufficient for trial, a nonfinal adjudication for purposes of 28 U.S.C. § 1291." *Id.* at 743. "Under *Johnson*, therefore, a determination that a given set of facts violates clearly established law is reviewable, while a determination that an issue of fact is 'genuine' is unreviewable." *See v. City of Elyria*, 502 F.3d 484, 490 (6th Cir. 2007);

This jurisdictional limitation requires that, if "the defendant disputes the plaintiff's version of the story, the defendant must nonetheless be willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal." *Berryman*, 150 F.3d at 563; *Meals v. City of Memphis*, 493 F.3d 720, 726-27 (6th Cir. 2007) ("[A] defendant is required to limit her argument to questions of law premised on facts taken in the light most favorable to the plaintiff."); *Sheets v. Mullins*, 287 F.3d 581, 585 (6th Cir. 2002) ("In this circuit, it is well established that, for appellate jurisdiction to lie over

an interlocutory appeal, a defendant seeking qualified immunity must be willing to concede to the facts as alleged by the plaintiff and discuss only the legal issues raised by the case."). "Once a defendant's argument drifts from the purely legal into the factual realm and begins contesting what really happened, our jurisdiction ends and the case should proceed to trial." *Berryman*, 150 F.3d at 564 (finding lack of jurisdiction to consider defendants' appeal to the extent that defendants "attempt[ed] to persuade us to believe their version of the facts"); *Harrison v. Ash*, 539 F.3d 510, 517 (6th Cir. 2008) ("Thus, to the extent that the denial of qualified immunity is based on a factual dispute, such a denial falls outside of the narrow jurisdiction of this Court.").

In *Scott v. Harris*, 550 U.S. 372 (2007), however, the Supreme Court recognized an apparent exception to this jurisdictional limitation when it considered and rejected a district court's denial of summary judgment even though the district court had found genuine issues existed as to material facts. In reaching that conclusion, and without addressing the issue of jurisdiction, the Court found that a video of the incident rendered the plaintiff's version of the facts "so utterly discredited by the record that no reasonable jury could have believed him." *Id.* at 380. In trying to reconcile *Scott* with the Supreme Court's edict in *Johnson*, this Court has concluded that "'where the trial court's determination that a fact is subject to reasonable dispute is blatantly and demonstrably false, a court of appeals may say so, even on interlocutory appeal.'"[3] *Wysong v. Heath*, 260 F. App'x 848, 853 (6th Cir. 2008) (quoting *Blaylock v. City of Philadelphia*, 504 F.3d 405, 414 (3rd Cir. 2007)).

It also is important to note that a district court's stated basis for denying an immunity claim "does not necessarily foreclose this Court's jurisdiction over [a party's] appeal." *City of Elyria*, 502 F.3d at 490; *see also Christophel v. Kukulinsky*, 61 F.3d 479, 485 (6th Cir. 1995) ("A defendant's right to appeal the denial of qualified immunity does not turn on the phrasing of the district court's order."). Rather, "'*regardless of the district court's reasons* for denying qualified immunity, we may exercise jurisdiction

---

[3]In *Wysong*, this Court found that the plaintiff's admission in his deposition that no factual dispute existed fell within this exception and warranted reversal of the district court's finding of disputed material facts. 260 F. App'x at 853-54.

over the . . . appeal to the extent it raises questions of law." *Williams v. Mehra*, 186 F.3d 685, 689-90 (6th Cir. 1999) (quoting *Dickerson*, 101 F.3d at 1157) (emphasis in *Williams*).

After reviewing Defendants' various qualified immunity claims, we conclude that, while these appeals predominantly raise questions of law that are capable of appellate review at this juncture, they also present some issues of fact that *Johnson* dictates are beyond the scope of our jurisdiction. Where the parties ask us to resolve factual disputes, we set those issues aside for resolution by the trial court. *See Gregory*, 444 F.3d at 742-43 ("To the extent that an appellant on interlocutory appeal argues issues of fact and law on appeal, this Court will only entertain pure issues of law.").

### 2. Defendants' Absolute Immunity Claims

Detective Ingles, Dr. Warnick, and Fournier also challenge the district court's denial of their claims of absolute testimonial or witness immunity, which they assert in response to those claims arising out of (or based in part on) their testimony at trial.

Unlike qualified immunity, the denial of a defense of absolute witness immunity generally is not immediately appealable because the "lack of interlocutory appeal from denials of witness immunity does not 'imperil [a] substantial public interest.'" *Kelly*, 447 F.3d at 949. Despite acknowledging that testimonial immunity "strengthens the substantial public interest of having witnesses come forward and testify truthfully," we nevertheless concluded in *Kelly* that the denial of such claims does not imperil that overarching interest because "private individuals . . . will appear as witnesses, at most, only a few times in their lives." *Id.* On that basis, we reasoned that permitting a suit to proceed against "private individuals" does not implicate the same interests as an appeal from the denial of public official immunity, where the relevant interest is more significant given that "the official, by spending more time than necessary to defend himself or herself in an action, would spend less time on the tasks for which he or she

was hired and cost the public additional money in defending a suit that should have been dismissed." *Id.*

Unlike the defendants before us in *Kelly*, however, the defendants asserting testimonial immunity in this case are a police officer, a forensic consultant, and the victim of a brutal crime. Moreover, each asserts immunity based on testimony delivered in the course of a criminal prosecution. In light of these factors, we conclude that the balance of interests at issue in this case differs dramatically from the interests implicated by the denial of immunity in *Kelly*. Because *Kelly* does not dispose of the question presented here, we must determine whether the denial of an absolute witness immunity claim asserted under these particular circumstances imperils a substantial public interest. We conclude that it does.

As to Detective Ingles and Dr. Warnick, the interests implicated by the district court's denial of their testimonial immunity claims are sufficiently akin to those implicated by the denial of public official immunity to support interlocutory review. As the Court noted in *Kelly*:

> Official immunity seeks to protect the ability of an official to exercise discretion in accomplishing public tasks and to prevent the official from spending time in court defending actions that are reasonably thought to be legal. Without interlocutory appeal from district court denials of immunity, the official, by spending more time than necessary to defend himself or herself in an action, would spend less time on the tasks for which he or she was hired and cost the public additional money in defending a suit that should have been dismissed. The lack of speedy resolution of the claim also threatens the official's decisiveness in taking action while the action is proceeding to trial.

447 F.3d at 949 (citation omitted). Those same interests are at stake where, as here, a district court denies the absolute immunity claim of a police officer or forensic investigator who testifies on behalf of the state as part of a criminal prosecution. *See Vakilian v. Shaw*, 335 F.3d 509, 515-16 (6th Cir. 2003) (considering interlocutory appeal from the denial of immunity asserted by a government investigator). Exposing police officers and forensic investigators to suit based on testimony they deliver as part of their official duties and on behalf of the state undoubtedly implicates their ability to exercise

their discretion and potentially inhibits them from performing their duties.[4] Unlike the parties before us in *Kelly*, "[s]ection 1983 lawsuits against police officer witnesses, like lawsuits against prosecutors, 'could be expected with some frequency.' Police officers testify in scores of cases every year, and defendants often will transform resentment at being convicted into allegations of perjury by the State's official witnesses." *Briscoe v. LaHue*, 460 U.S. 325, 343 (1983) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 425 (1976)). Furthermore, because Detective Ingles and Dr. Warnick represented the State of Michigan in the underlying criminal proceedings against Moldowan, their exposure to suit also "would cause a continuing injury to the State's dignitary interests every additional day that [its officials] must remain in federal court." *Kelly*, 447 F.3d at 949.

As to Fournier, we also conclude that the denial of her assertion of absolute immunity warrants immediate review as it would imperil substantial public interests. Although Fournier undoubtedly is a "private individual" and not a public official, the balance of interests implicated here differs significantly from those at issue in *Kelly* because the claims against her arose out of testimony she delivered as a victim witness in the course of a criminal trial.

Extending interlocutory review to the denial of a testimonial immunity claim in this context serves several important public interests. Most obviously, immunity from suit prevents witness intimidation and self-censorship. Declining interlocutory review under these circumstances would expose victims of crimes who testify in criminal proceedings to suit—including the discovery, depositions, hearings, trials, and other proceedings that attend civil actions—and thus would create a substantial disincentive for victims to come forward to identify their attackers. That concern, in turn, implicates

---

[4] Among other things, Moldowan claims that this Court lacks jurisdiction to consider Detective Ingles' appeal because Ingles is now retired. Moldowan, however, offers no authority to support his contention that this is a relevant consideration. Moreover, Moldowan's claims against Detective Ingles arise out of testimony Ingles delivered as an active police officer with the Warren Police Department in the course of his official duties. Consequently, granting Moldowan's motion obviously will resound much further than the limits of this case. Indeed, by denying Detective Ingles' assertion of immunity with respect to Moldowan's *Brady* claims, the district court implicitly concluded that *Brady* could support a claim against a police officer who fails to disclose exculpatory materials to the prosecutor's office, as that question of law lay at the heart of those claims. That conclusion obviously has implications that reach beyond the unique circumstances of this case. Accordingly, this Court has jurisdiction to consider Detective Ingles' appeal. *See City of Elyria*, 502 F.3d at 489-90.

the effective administration of the criminal justice system, which is undoubtedly a weighty public interest. *See Briscoe*, 460 U.S. at 343 (recognizing absolute testimonial immunity for police officers because their testimony, among other things, provides a significant "contribution to the judicial process").

This concern is all the more significant in this particular context because Fournier was the victim of a brutal sexual assault, and thus the threat of being dragged through the rigors of a civil suit based on her identification of, and testimony against, her alleged attacker would create a tremendous emotional hardship on her. Declining to consider Fournier's appeal ultimately would create a significant disincentive for other victims of rape and sexual assault to come forward and testify against their attackers. Victims of crimes, especially the types of crimes that occurred here, must feel secure that cooperating with the police will not expose them to lengthy and invasive civil proceedings. The denial of immunity imperils that interest because subjecting victim witnesses to the proceedings attendant to civil litigation potentially re-exposes them to significant emotional trauma. As Fournier's brief to this Court succinctly frames the issue: "If a woman who has been sodomized, beaten and left permanently disabled can be sued and subjected to an endless retread of the brutalization against her through deposition and discovery, the entire criminal justice system is put at risk." Fournier Br. at 22. We agree.

Moreover, as the Supreme Court has noted, it is "the right and privilege" of individuals "to aid in the execution of the laws of his country by giving information to the proper authorities of violations of those laws," and that right "may properly be said to be secured by the Constitution and laws of the United States." *Motes v. United States*, 178 U.S. 458, 462-63 (1900).

For these reasons, we hereby **DENY** Moldowan's motions to dismiss. The collateral order doctrine is satisfied here because Defendants' absolute and qualified immunity claims not only would be irretrievably lost if this case were to proceed to trial, but also because subjecting these particular Defendants to civil proceedings implicates

substantial public interests.  Again, however, we may consider Defendants' appeals only to the extent that they raise pure questions of law.  *See Johnson*, 515 U.S. at 313-18.

### III.

We review the district court's denial of summary judgment *de novo*, using the same Rule 56(c) standard as the district court.  *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 389 (6th Cir. 2008); *Williams*, 186 F.3d at 689.  Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)).

At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record that demonstrate the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, however, the moving party may meet its burden by showing "that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325.  When the moving party has carried this burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586.  The non-moving party also may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial.  *Id.*; Fed. R. Civ. P. 56(e)(2).

After the parties have presented their evidence, "the judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.  In evaluating the

evidence, the court must draw all inferences in the light most favorable to the non-moving party. *Matsushita,* 475 U.S. at 587. "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

That Defendants' motions for summary judgment were based on claims of absolute and qualified immunity does not affect the standard of review that applies. *See Gregory*, 444 F.3d at 737. Whether a defendant is entitled to absolute or qualified immunity from liability under 42 U.S.C. § 1983 is a legal question that this Court reviews *de novo*. *Id.* at 737, 742.

## IV.

Having determined that we have jurisdiction to consider Defendants' interlocutory appeals and settled the standard of review that applies, we now turn to the merits of Defendants' claims. First, we consider the qualified and absolute immunity claims raised in Case No. 07-2115, the appeal of the City of Warren, Detective Ingles, and Officer Schultz.

### A. Qualified Immunity

"Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. "The central purpose of affording public officials qualified immunity from suit is to protect them 'from undue interference with their duties and from potentially disabling threats of liability.'" *Elder v. Holloway*, 510 U.S. 510, 514 (1994) (quoting *Harlow*, 457 U.S. at 806).

In *Williams v. Mehra*, *supra*, this Court articulated a "tripartite" procedure for evaluating claims of qualified immunity:

> First, we determine whether a constitutional violation occurred; second, we determine whether the right that was violated was a clearly

> established right of which a reasonable person would have known; finally, we determine whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

186 F.3d at 691 (citing *Dickerson*, 101 F.3d at 1157-58). The first step in our inquiry, then, is to consider the "threshold question" whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.* If a violation could be made out on a favorable view of the parties' submissions, however, we must then consider whether the right was "clearly established." "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* Finally, and only if these first two elements are satisfied, this Court "occasionally" has gone on to determine "'whether the plaintiff offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.'" *Drogosch v. Metcalf*, 557 F.3d 372, 378 (6th Cir. 2008) (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 n.2 (6th Cir. 2005)).

In *Pearson v. Callahan*, ___ U.S. ___, 129 S. Ct. 808 (2009), the Supreme Court recently reconsidered the mandatory nature of the inquiry set forth in *Saucier*, concluding that, "while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory." *Id.* at 818. Acknowledging several drawbacks to the sequence required under *Saucier*, the Court reasoned that "[t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* Although rejecting the mandatory nature of the *Saucier* framework, the Court nevertheless

recognized that applying that framework "is often beneficial." *Id.* In light of *Pearson*, then, we still are required to address the same questions in conducting our qualified immunity analysis, but now we are free to consider those questions in whatever order is appropriate in light of the issues before us.

"Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006) (citing *Barrett v. Steubenville City Schools*, 388 F.3d 967, 970 (6th Cir. 2004)).

### B.  Absolute Immunity

"More limited in application, but certainly broader in protection, is absolute immunity, which the Supreme Court has held applies to the performance of certain functions when those functions are integral to the functioning of our adversarial judicial system." *Gregory*, 444 F.3d at 738 (citing *Briscoe*, 460 U.S. at 345). In defining the scope of the absolute immunity doctrine, the Supreme Court has employed a functional test: "Those functions more 'intimately associated with the judicial phase of the criminal process' are more likely to merit careful consideration for absolute immunity. In contrast, those functions more 'investigative' in nature – searching for 'clues and corroboration' – are more removed from the judicial process and merit only qualified immunity." *Id.* (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993)).

Unlike qualified immunity, "[t]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Buckley*, 509 U.S. at 269.

### C.  Analysis

In his complaint, Moldowan seeks recovery under 42 U.S.C. § 1983 for various alleged violations of his constitutional rights. Section 1983, however, "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). Consequently, to determine whether

Moldowan asserts a violation of a clearly established constitutional right, it is necessary to examine the substantive rights underlying each of Moldowan's remaining requests for relief. *See Baker*, 443 U.S. at 140 ("The first inquiry in any § 1983 suit" is "to isolate the precise constitutional violation with which [the defendant] is charged."). That Moldowan asserts claims under various constitutional provisions does not control our inquiry. Rather, the critical question is whether the "legal norms" underlying those claims implicate clearly established constitutional rights. *See Mitchell*, 472 U.S. at 528. For that reason, we group and address Moldowan's claims according to the conduct at issue or the legal norms that underlie his various claims.

### 1.  Counts IX, X, XI, XII — *Brady* Claims (Ingles)

Moldowan asserts a number of claims against Detective Ingles under the Fourth, Fifth, Sixth, and Fourteenth Amendments based on Ingles' alleged failure to disclose exculpatory evidence. In particular, Moldowan contends that Ingles was required to disclose exculpatory statements from Burroughs, including that Burroughs recalled seeing four African-American males standing around Fournier on the morning that she was discovered in Detroit and that Burroughs later overheard two of those men discussing their involvement in the assault.[5]

Moldowan's allegations, although asserted under various constitutional provisions, present claims under *Brady v. Maryland*, 373 U.S. 83 (1963). In *Brady*, the Court held that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. The question we confront here is whether Detective Ingles' alleged suppression of Burroughs'

---

[5]Although Detective Ingles disputes whether he ever interviewed Burroughs, that dispute does not affect our authority to consider the inherently prior, and purely legal question at issue here. While we cannot resolve that factual dispute, the threshold issue of whether Moldowan may assert a *Brady*-type claim for damages against a police officer may be resolved on interlocutory appeal.

statements violated the same "legal norm" underlying the due process violation recognized in *Brady*.  We hold that it does.**6**

Detective Ingles argues that Moldowan cannot demonstrate that the Due Process Clause imposes on the police a clearly established obligation to disclose exculpatory information.  Superficially, that argument has some appeal.  To the extent that *Brady* imposes an obligation on the state to disclose exculpatory evidence to the defense, courts consistently have determined that this duty falls squarely on the prosecutor, not the police.  *See Giglio v. United States*, 405 U.S. 150, 154 (1972) ("[W]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor."); *Lindsay v. Bogle*, 92 F. App'x 165, 170 (6th Cir. 2004) (stating that "the *Brady* obligation applies only to prosecutors").  In *Kyles v. Whitley*, 514 U.S. 419 (1995), for instance, the Supreme Court explained that "the individual prosecutor," who "alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached."  *Id.* at 437; *see also Strickler v. Greene*, 527 U.S. 263, 281 (1999) (recognizing "the special role played by the American prosecutor in the search for truth in criminal trials").  In fact, the Supreme Court has placed the responsibility to manage the state's disclosure obligations solely on the prosecutor despite acknowledging that "no one doubts that police investigators sometimes fail to inform a prosecutor of all they know."  *Kyles*, 514 U.S. at 438.

This well-established rule, however, does not resolve whether the police have a concomitant or derivative duty under the constitution to turn potentially exculpatory material over to the prosecutor.  In fact, Moldowan acknowledges that the duty to "disclose" exculpatory materials to defense counsel rests on the prosecutor alone, but nevertheless maintains that the police have an analogous, but just as constitutionally-significant, obligation to turn such materials over to the prosecutor's office.  Underlying Moldowan's argument is the valid concern that, if the police have no constitutional

---

**6**However, we reject Moldowan's attempt to construe these claims as substantive due process claims, as they more properly are understood as procedural due process violations. *See Brady*, 373 U.S. at 87; *Graham*, 490 U.S. at 395.

obligation in this regard, then the state could sidestep its constitutionally-mandated disclosure obligations by maintaining an unstated, but nevertheless pervasive, wall of separation between the prosecutor's office and the police with regard to the existence of potentially exculpatory evidence. Ignoring the burdens that the Constitution places on the police in this context also creates a very serious risk that police officers who conceal or withhold evidence that falls within *Brady*'s ambit will never be held accountable for the independent "deprivation of any rights, privileges, or immunities secured by the Constitution," 42 U.S.C. § 1983, that their conduct causes.

As the concurrence correctly notes, however, the Supreme Court already has addressed the first of these concerns, at least to a certain extent, by imposing on the prosecutor "a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles*, 514 U.S. at 437. In other words, even though the state's obligation under *Brady* is managed by the prosecutor's office, that obligation "applies to relevant evidence in the hands of the police, whether the prosecutors knew about it or not, whether they suppressed it intentionally or not, and whether the accused asked for it or not." *Harris v. Lafler*, 553 F.3d 1028, 1033 (6th Cir. 2009) (citations omitted); *Strickler*, 527 U.S. at 280-81 (*Brady* "encompasses evidence 'known only to police investigators and not to the prosecutor'" (quoting *Kyles*, 514 U.S. at 438)).

Contrary to Detective Ingles' suggestion, however, this does not imply that the police have no role to play in ensuring that the state complies with its obligations under *Brady*, or that the police cannot commit a constitutional violation analogous to the deprivation recognized in *Brady*. *See Banks v. Dretke*, 540 U.S. 668, 675-76 (2004) ("When *police or* prosecutors conceal significant exculpatory or impeaching material in the State's possession, it is ordinarily incumbent on the State to set the record straight." (emphasis added)). On the contrary, although the prosecutor is the state's "official representative . . . in the prosecution of the case," we have recognized that the police "also play[] an active role in the prosecution." *Hilliard v. Williams*, 516 F.2d 1344, 1350 (6th Cir. 1975), *vacated in part*, 424 U.S. 961, *aff'd on remand*, 540 F.2d 220 (6th Cir.

1976); *see also Walker v. Lockhart*, 763 F.2d 942, 958 (8th Cir. 1985) ("Police are treated as an arm of the prosecution for *Brady* purposes."). Because the prosecutor's office generally lacks its own investigative machinery, prosecutors often are entirely dependent on the police to turn over the fruits of their investigation. As a result of this interdependence, the police play a different, but no less significant role in the state's "search for truth in criminal trials." *Strickler*, 527 U.S. at 281.

Because prosecutors rely so heavily on the police and other law enforcement authorities, the obligations imposed under *Brady* would be largely ineffective if those other members of the prosecution team had no responsibility to inform the prosecutor about evidence that undermined the state's preferred theory of the crime. As a practical matter then, *Brady*'s ultimate concern for ensuring that criminal defendants receive a "fundamentally fair" trial, *see United States v. Bagley*, 473 U.S. 667, 675 (1985) (explaining that the "purpose" of the *Brady* rule is "to ensure that a miscarriage of justice does not occur"), demands that "*Brady*'s protections also extend to actions of other law enforcement officers such as investigating officers," *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008). Although this Court has not yet directly addressed the issue, a number of our decisions support this conclusion. *See, e.g.*, *Gregory*, 444 F.3d at 743-45 (dismissing appeal from denial of qualified immunity in the context of *Brady* claims against police officers and forensic medical examiners)[7]; *Spurlock v. Satterfield*, 167

_____

[7]The concurrence argues that our citation to *Gregory* is misplaced because we "decided *Gregory* emphatically on jurisdictional grounds." Slip op. at 65. In *Gregory*, we considered, among other things, an appeal from the district court's denial of qualified immunity in the context of *Brady* claims brought against a police officer with the Louisville Division of Police and an examiner with the Kentucky State Police Crime Laboratory. The defendant officer argued that the plaintiff had failed to established that the officer "was aware of the [evidence] or that the [evidence] was, in fact, exculpatory." 444 F.3d at 743. Likewise, the defendant examiner argued that "her 'failure to disclose,' if any, amounts only to negligence." *Id.* at 744. We dismissed both claims on the grounds that we lacked jurisdiction to consider those disputed issues of fact on interlocutory appeal. *Id.* at 743-44 (citing *Johnson*, 515 U.S. at 313). In that limited sense, the concurrence is right that our holding in *Gregory* is of limited precedential value. But it is not entirely irrelevant. Under *Williams v. Mehra*, our initial inquiry in any qualified immunity case must be to determine whether the plaintiff's claims implicate a clearly established constitutional right. *See* 186 F.3d at 691. Consequently, before the *Gregory* court even considered its jurisdiction to address those factual disputes, it must have been satisfied that *Brady* could support the plaintiff's claims. The court undoubtedly had jurisdiction to consider whether this "threshold" requirement had been satisfied. *See Saucier*, 533 U.S. at 201. If the *Gregory* court believed that *Brady* could not support the plaintiff's claims against the officer and examiner, it certainly would not have sent the case back to the district court for further proceedings on those claims. However, because our decision in *Gregory* did not address the issue, or perhaps because the issue had been waived, we acknowledge that *Gregory* offers limited support. For all of these criticisms, however, the concurrence can point to no case in this circuit rejecting the notion that the Constitution imposes on the police a duty analogous to that recognized in *Brady*.

F.3d 995, 1005-06 (6th Cir. 1999) (relying on *Brady* to conclude that plaintiff had raised claims against a police officer that implicated clearly established constitutional rights); *cf. Sutkiewicz v. Monroe County Sheriff*, 110 F.3d 352, 361 (6th Cir. 1997) (finding sheriff's department's failure to turn patently exculpatory information over to the prosecutor resulted in "substantial injustice" which warranted a new trial).

In addition to this practical justification, it is evident that the constitutional principles recognized in *Brady* apply just as equally to similar conduct on the part of police, and thus support our recognizing that the police can commit a constitutional deprivation analogous to that recognized in *Brady* by withholding or suppressing exculpatory material. "Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness." *California v. Trombetta*, 467 U.S. 479, 485 (1984); *Lisenba v. California*, 314 U.S. 219, 236 (1941) ("The aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence, whether true or false."). The "overriding concern" in defining the contours of the state's disclosure obligations under the Due Process Clause, therefore, must be "the justice of the finding of guilt." *United States v. Agurs*, 427 U.S. 97, 112 (1976). As far as the Constitution is concerned, a criminal defendant is equally deprived of his or her due process rights when the police rather than the prosecutor suppresses exculpatory evidence because, in either case, the impact on the fundamental fairness of the defendant's trial is the same.

Although the prosecutor undoubtedly plays a "special role" in "the search for truth in criminal trials," *Strickler*, 527 U.S. at 281, the police also play a unique and significant role in that process, and thus also are bound by the government's constitutional obligation to "ensure that a miscarriage of justice does not occur," *Bagley*, 473 U.S. at 675. As the Fourth Circuit explained persuasively in *Barbee v. Warden, Maryland Penitentiary*, 331 F.2d 842 (4th Cir. 1964):

> The police are also part of the prosecution, and the taint on the trial is no less if they, rather than the State's Attorney, were guilty of the nondisclosure . . . The duty to disclose is that of the state, which

> ordinarily acts through the prosecuting attorney; but if he too is the victim of police suppression of the material information, the state's failure is not on that account excused.

*Id.* at 846.  In other words, because the police are just as much an arm of the state as the prosecutor, the police inflict the same constitutional injury when they hide, conceal, destroy, withhold, or even fail to disclose material exculpatory information.[8]

While the concurrence is correct that the Supreme Court has held that, technically speaking, the government's "*disclosure*" obligations fall to and must be managed by the prosecutor, *Kyles*, 514 U.S. at 437 (emphasis added), that argument overlooks that the Court's decisions also make clear that the constitutional concerns underlying *Brady* reach more broadly to preclude other governmental "authorities" from making a "calculated effort to circumvent the disclosure requirements established by *Brady* [] and its progeny," *Trombetta*, 467 U.S. at 488.  As Judge Murnaghan succinctly explained in his dissent in *Jean v. Collins*, 221 F.3d 656 (4th Cir. 2000) (en banc):

> Of course, the manner in which prosecutors and police officers comply with *Brady* is different, reflecting their different functions in the criminal justice system.  Police officers do not disclose evidence to criminal defendants directly.  Instead, the police accumulate evidence and then ministerially deliver it to the prosecutor.  The prosecutor then makes a discretionary legal judgment about whether the evidence is material and exculpatory, such that *Brady* compels its disclosure to the defendant.

*Id.* at 664.  Although the police and prosecutor play different roles in this process, "[t]his functional differentiation . . . should not obscure the fact that *Brady* creates a singular constitutional duty, which prosecutors and police officers are capable of breaching in factually different ways."  *Id.*

In addition to these practical justifications and constitutional considerations, the police's obligation to turn over material and exculpatory evidence also follows inexorably from the Supreme Court's recognition that the police have a constitutional duty to preserve such evidence.  In *Trombetta*, the Supreme Court observed that

---

[8]Although the concurrence acknowledges that the fundamental concern of the Due Process Clause is to ensure "the fairness of criminal trials," slip op. at 62, it loses sight of the fact that the conduct of the police can jeopardize the fairness of a criminal trial just as much as that of the prosecutor.

"[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense." 467 U.S. at 488. The Court recognized that same duty in *Arizona v. Youngblood*, 488 U.S. 51 (1988), confirming that the Constitution imposes at least a limited "obligation" on the police "to preserve evidence . . . [that] could form the basis for exonerating the defendant." *Id.* at 58. If the Constitution imposes a "duty" and "obligation" on the police to preserve such evidence, that duty, no matter how limited, certainly must preclude the police from concealing that exact same information from the prosecutor, the defense, and the courts. Why else would the police be required to *preserve* such evidence if they had no attendant obligation to *reveal* its existence? *Brady* and *Trombetta* would impose hollow obligations indeed if the Constitution did not also preclude police officers from concealing the same evidence that they are not permitted to destroy and that the prosecutor is required to disclose.

The concurrence argues that the police cannot share in the state's obligations under *Brady* because "the *Brady* duty is uniquely tailored to prosecutors" in that it requires the disclosure of exculpatory evidence that is constitutionally "material," and thus requires the exercise of "a judgment that prosecutors, not police officers, are trained to make."[9] Slip op. at 61. This argument misses the point. We agree that determining whether a particular piece of evidence is "material," as defined in *Bagley*, 473 U.S. at 682, generally requires the exercise of legal judgment that the prosecuting attorney is better trained, not to mention better positioned, to make. *See Kyles*, 514 U.S. at 437. However, that implies only that the prosecutor should be assigned the responsibility of

---

[9]In making this argument, the concurrence relies heavily on Judge Wilkinson's concurring opinion in *Jean v. Collins*, but does not even attempt to wrestle with Judge Murnaghan's persuasive response to that argument:

> This observation is a strawman that confuses the crucial issue. It presupposes that when a police officer discloses evidence to a prosecutor, the act is functionally identical to the discretionary legal judgment prosecutors make when disclosing evidence directly to criminal defendants. In reality, the two acts are incommensurable. Requiring police officers to disclose evidence to prosecutors does not require technical legal expertise because the act is essentially ministerial, not discretionary. The police officer's duty is not to determine whether the evidence is material and exculpatory. His duty is simply to collect the evidence and to disclose all of it to the prosecutor, who then makes the discretionary legal judgment about its material, exculpatory attributes.

221 F.3d at 669 (Murnaghan, J., dissenting).

determining what evidence ultimately should be *disclosed* to the defendant; it does not imply, as our colleague suggests, that the police cannot be expected to recognize and determine what evidence should be preserved and turned over to the prosecutor. On the contrary, the Supreme Court already has assumed as much in concluding that the police have a constitutionally-significant "duty" to "preserve evidence . . . that might be expected to play a significant role in the suspect's defense." *Trombetta*, 467 U.S. at 488-89 (holding that the police were not obliged to preserve evidence because the "exculpatory value" of the evidence was not "apparent"). If the police can be expected to recognize what evidence must be preserved, certainly it is not too burdensome to demand that they simply turn that same information over to the prosecutor's office.

For most of the same reasons we have laid out here, virtually every other circuit has concluded either that the police share in the state's obligations under *Brady*, or that the Constitution imposes on the police obligations analogous to those recognized in *Brady*.[10] *See, e.g.*, *Brady v. Dill*, 187 F.3d 104, 114 (1st Cir. 1999) ("One standard police function is to provide information to the prosecutor and the courts. Thus, a police officer sometimes may be liable if he fails to apprise the prosecutor or a judicial officer of known exculpatory information."); *Hart v. O'Brien*, 127 F.3d 424, 446-47 (5th Cir. 1997) ("[A] plaintiff states a section 1983 claim against a police officer who, after learning of 'patently exculpatory evidence,' deliberately fails to disclose it to the prosecutor." (citation omitted)); *McMillan v. Johnson*, 88 F.3d 1554, 1569 (11th Cir. 1996) ("Our case law clearly established that an accused's due process rights are violated when the police conceal exculpatory or impeachment evidence.") (collecting cases); *Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992) ("The police satisfy their obligations under *Brady* when they turn over exculpatory evidence to the prosecutors."); *Geter v. Fortenberry*, 882 F.2d 167, 171 (5th Cir. 1989) (affirming denial of qualified immunity for police officer defendant with respect to plaintiff's claim that the officer failed to disclose exculpatory evidence); *Jones v. City of Chicago*, 856 F.2d

---

[10]"[W]hile analogous decisions from our sister circuits are not binding, we have repeatedly recognized their persuasive authority." *See Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 553 n.6 (6th Cir. 2007).

985, 995 (7th Cir. 1988) ("*Brady v. Maryland* does not require the police to keep written records of all their investigatory activities; but attempts to circumvent the rule of that case by retaining records in clandestine files deliberately concealed from prosecutors and defense counsel cannot be tolerated."). As this litany of cases indicates, the courts consistently have rejected the notion that the police have no role to play in carrying out the state's constitutionally-mandated obligations in this area. Although the prosecutor's office bears primary responsibility for carrying out the state's actual "disclosure" obligations under *Brady*, the police bear, as the Eighth Circuit has put it, an equally important "*Brady*-derived" responsibility to turn over potentially exculpatory evidence to the prosecutor's office. *White*, 519 F.3d at 814. Semantic quibbles aside, there is no doubt that the police are just as capable of depriving criminal defendants of a fundamentally fair trial by suppressing exculpatory evidence.

Having determined that the due process guarantees recognized in *Brady* also impose an analogous or derivative obligation on the police, we next must determine whether that obligation was "clearly established" as of the date of Detective Ingles' alleged violation of that duty. In determining whether a right is clearly established, we "may rely on decisions of the Supreme Court, decisions of this court and courts within this circuit, and in limited instances, on decisions of other circuits." *Spurlock*, 167 F.3d at 1006; *Ohio Civil Serv. Employees Assoc. v. Seiter*, 858 F.2d 1171, 1177 (6th Cir. 1988). In evaluating the relevant case law, we must determine whether the right has been recognized "in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In other words, "the unlawfulness must be apparent." *Id.*

Decisions from other circuits recognizing the type of "*Brady*-derived" claims that Moldowan asserts here date back as far as 1964. *See Barbee*, 331 F.2d at 846. In fact, at least three circuits recognized prior to August 1990, the earliest possible date for Detective Ingles' involvement in the case, that this right was clearly established. *See, e.g.*, *id.*; *Geter*, 882 F.2d at 171; *Jones*, 856 F.2d at 995. Although our recognition of

this type of a claim is more recent and less specific, the overwhelming number of decisions from other circuits recognizing this type of claim satisfies us that any reasonable police officer would know that suppressing exculpatory evidence was a violation of the accused's constitutional rights.

Having determined that Moldowan's claims against Detective Ingles implicate a clearly established constitutional right, we next must determine whether, taking the facts alleged by Moldowan as true, Moldowan can make out a violation of this right. At Moldowan's retrial, Jerry Burroughs testified that he witnessed four African-American males standing in the street around Fournier's body in the early morning hours of August 9, 1990. Burroughs also testified that he witnessed one of the men kick her, and that shortly thereafter he saw the men drive away from the scene in a light-colored van. Burroughs also testified that he later overheard two of the men he saw standing around Fournier's body talking about the incident and claiming involvement in the assault. Burroughs testified that he reported this information to a police officer, but the officer "just acted like I [was] saying nothing." (J.A. 2157.) Although Burroughs could not remember the name of the officer with whom he spoke, Moldowan claims that it must have been Detective Ingles. It is without question that Detective Ingles did not report any such information to the Macomb County Prosecutor, or to defense counsel for that matter.

Construing these facts in the light most favorable to Moldowan, it is evident that Burroughs' statements cast serious doubt on, if not entirely discredit, Fournier's identification of Moldowan as one of her attackers, an issue that undoubtedly was one of the most important elements of the state's case. Burroughs' statements thus should have been disclosed to the defense as they undoubtedly "would tend to exculpate" Moldowan. *See Brady*, 373 U.S. at 88.

Defendants contend that, even if we were to conclude that the legal norms underlying *Brady* can support an analogous or derivative claim against a police officer, Moldowan cannot prevail on the facts presented here because he cannot show that Detective Ingles withheld these statements in "bad faith." In particular, Defendants

argue that, in *Davidson v. Cannon*, 474 U.S. 344 (1986), and *Daniels v. Williams*, 474 U.S. 327 (1986), the Supreme Court held that the Due Process Clause is not "triggered by lack of due care" by government officials, *Daniels*, 474 U.S. at 333, and thus "where a government official is merely negligent in causing the injury, no procedure for compensation is constitutionally required," *Davidson*, 474 U.S. at 347.

Although this Court has not addressed the issue directly, *see Gregory*, 444 F.3d at 743-44, at least two of our sister circuits have suggested that, in order to assert such a claim against the police, at least under § 1983, a defendant-turned-plaintiff must demonstrate that the police acted in "bad faith." *See, e.g.*, *Porter v. White*, 483 F.3d 1294 (11th Cir. 2007) ("hold[ing] that the no-fault standard of care *Brady* imposes on prosecutors in the criminal or habeas context has no place in a § 1983 damages action against a law enforcement official in which the plaintiff alleges a violation of due process"); *Villasana v. Wilhoit*, 368 F.3d 976, 980 (8th Cir. 2004) ("[T]he recovery of § 1983 damages requires proof that a law enforcement officer other than the prosecutor intended to deprive the defendant of a fair trial."). At least one other circuit, however, previously held that no such showing of bad faith is required:

> Failure of the police to reveal such material evidence in their possession is equally harmful to a defendant whether the information is purposely, or negligently, withheld. And it makes no difference if the withholding is by officials other than the prosecutor. The police are also part of the prosecution, and the taint on the trial is no less if they, rather than the State's Attorney, were guilty of the nondisclosure. If the police allow the State's Attorney to produce evidence pointing to guilt without informing him of other evidence in their possession which contradicts this inference, state officers are practicing deception not only on the State's Attorney but on the court and the defendant. 'The cruelest lies are often told in silence.' If the police silence as to the existence of the reports resulted from negligence rather than guile, the deception is no less damaging.

*Barbee*, 331 F.2d at 846.[11]

---

[11] It is unclear whether the rule announced in *Barbee* remains good law after *Jean v. Collins*. Because the en banc Fourth Circuit was "equally divided" in *Jean*, it issued a per curiam order affirming the judgment of the district court without opinion. *See* 221 F.3d at 658. Although Judge Wilkinson's concurring opinion ignores the holding of *Barbee* and asserts that bad faith is required in this context, *see id.* at 660 ("[I]t would be impermissible to hold the police liable for due process violations under § 1983

The question we have before us is a difficult one, with, as the concurrence rightfully points out, significant policy implications on both sides. But our job is not to craft the law to fit our policy views, it is to determine what the law requires. Notwithstanding the concurrence's argument to the contrary, the cases in this area clearly establish that police actions taken in bad faith are not the only species of police conduct that can deprive criminal defendants of the due process guaranteed by the Constitution. We acknowledge that a number of courts, including the Supreme Court, have held that a showing of bad faith is required to prevail on a claim that the police deprived a defendant of due process by concealing or withholding evidence that is only "potentially useful." But, where the police are aware that the evidence in their possession is exculpatory, the Supreme Court's decisions in this area indicate that the police have an *absolute* duty to preserve and disclose that information. The critical issue in determining whether bad faith is required thus is not whether the evidence is withheld by the prosecutor or the police, but rather whether the exculpatory value of the evidence is "apparent" or not.

In *Agurs*, for instance, the Court held that prosecutors are required to turn over to the defense evidence that was "so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce" even without a defense request. 427 U.S. at 107. The Court explained that the constitutional violation arose not because of the title of the government official that withheld the evidence, but rather because the failure to turn over such evidence "deprived the defendant of a fair trial." *Id.* at 108. As the Court explained: "Nor do we believe the constitutional obligation is measured by the moral culpability, or the willfulness, of the prosecutor. If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor." *Id.* at 110.

In other words, the critical issue in determining whether government conduct deprived a criminal defendant of a fair trial is the nature of the evidence that was

---

where they have acted in good faith."), that position did not garner the support of a majority of the en banc Fourth Circuit.

withheld; it emphatically is not the mental state of the government official who suppressed the evidence. That the due process inquiry is concerned with the nature of the evidence rather than the good or bad faith of the state actor reflects, as the Court emphasized, the Due Process Clause's "overriding concern with the justice of the finding of guilt." *Id.* at 112; *accord Napue v. Illinois*, 360 U.S. 264, 270 (1959) (holding that the knowing use of perjured testimony violates the Due Process Clause even when "the district attorney's silence was not the result of guile or a desire to prejudice . . . *for its impact was the same*, preventing, as it did, a trial that could in any real sense be termed fair" (citation omitted) (emphasis added)). That same reasoning is reflected in *Brady*'s holding that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or punishment, *irrespective* of the good faith or bad faith of the prosecution." 373 U.S. at 87 (emphasis added). Although both *Agurs* and *Brady* involved due process violations by the prosecutor rather than the police, the critical lesson of those decisions is that the constitutional violation arose because of the nature of the evidence, not the state of mind of the state actor. *See Strickler*, 527 U.S. at 288 ("[U]nder *Brady* an inadvertent nondisclosure has the same impact on the fairness of the proceedings as deliberate concealment.").

Notwithstanding the reasoning underlying *Agurs* and *Brady*, the concurrence contends that Moldowan's due process claim should be evaluated under the "bad-faith standard" set forth in *Arizona v. Youngblood*, which the concurrence insists "requires proof that the officer engaged in 'a conscious effort to suppress exculpatory evidence.'" Slip op. at 66 (quoting *Trombetta*, 467 U.S. at 488). This heightened standard is justified, the concurrence argues, because extending *Brady*'s "absolute duty" to law enforcement officers who do not enjoy absolute immunity will "unleash" a flood of lawsuits "that will be very difficult to stop short of trial." Slip op. at 63. We respectfully disagree.

However, *Youngblood* does not impose a bad faith requirement on any and all due process claims brought against police officers. On the contrary, just like *Brady* and

*Agurs*, the Court's decision in *Youngblood* confirms that where "material exculpable evidence" is concerned, the mental state of the government official withholding that evidence is not relevant to determining whether a due process violation has occurred. 488 U.S. at 57-58. In discussing the scope of the police's duty to preserve evidence, the Court contrasted the state's absolute obligation to *disclose* "material exculpable evidence" with its much more limited obligation to *preserve* "potentially useful evidence," holding that a showing of bad faith was required to show a constitutional violation only in the latter context. *Id.* at 57-58. Although, as the concurrence correctly points out, the Court rejected the bad-faith requirement in the context of due process guarantees "as interpreted in *Brady*," that turn of phrase does not bear the weight that our colleague places on it. Far from suggesting that the difference in the applicable standards turns on the job title of the government official who destroyed or concealed the evidence in question, the Court's decision in *Youngblood* actually explained:

> Part of the reason for the difference in treatment is found in the observation made by the Court in *Trombetta*, that "[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." Part of it stems from our unwillingness to read the "fundamental fairness" requirement of the Due Process Clause, as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution. We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.*, those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant.

*Id.* at 57-58 (citations omitted). In other words, *Youngblood* confirms that the "reason for the difference" in the applicable standards is the nature of the evidence at issue, not the title of the government official or whether the challenged conduct relates to the state's failure to disclose evidence rather that its failure to preserve it. *See Illinois v. Fisher*, 540 U.S. 544, 549 (2004) (explaining that "the applicability of the bad-faith requirement in *Youngblood* depended . . . on the distinction between 'materially

exculpatory' evidence and 'potentially useful' evidence"); *United States v. Wright*, 260 F.3d 568, 570 (6th Cir. 2001) ("Separate tests are applied to determine whether the government's failure to preserve evidence rises to the level of a due process violation in cases where material exculpatory evidence is not accessible versus cases where 'potentially useful' evidence is not accessible.").

Unlike the destruction or concealment of merely "potentially useful" evidence, the loss of "materially exculpatory" evidence directly threatens the fundamental fairness of a criminal trial, and thus undoubtedly implicates the Due Process Clause. In "that class of cases," *Youngblood* says, "the interests of justice" simply impose a higher burden on state actors, including the police. 488 U.S. at 58. That is true regardless of whether the defendant is asserting a failure-to-preserve or a failure-to-disclose claim, and regardless of whether the claim is being asserted against the prosecutor or the police. *See United States v. Branch*, 537 F.3d 582, 589 (6th Cir. 2008) (stating, in the context of a claim against a police officer, that "[t]he failure to preserve material exculpatory evidence violates the defendant's right to due process regardless of whether the government acted in bad faith"); *Wright*, 260 F.3d at 570 (stating, in the context of a claim against a fire investigator, that "[t]he destruction of material exculpatory evidence violates due process regardless of whether the government acted in bad faith").

Indeed, the only way to make sense of this critical passage from *Youngblood* is to read the phrase "the police's obligation" in the last sentence as referring to the statement from the previous sentence regarding the police's "undifferentiated and absolute duty." When given a proper reading, *Youngblood* thus confirms that the police have "an undifferentiated and absolute duty to retain and preserve" certain evidence, but that "[absolute] obligation" is limited to "those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant."[12]

_____

[12]Our reading of *Youngblood* also finds support in the case law of our sister circuits. In *Olszewski v. Spencer*, 466 F.3d 47 (1st Cir. 2006), for instance, the First Circuit declined to resolve this issue, but observed that "[a] variety of other circuits have considered the relationship between *Trombetta* and *Youngblood* and have concluded that (1) the destruction of 'apparently exculpatory' evidence does not require a showing of bad faith but that (2) if the evidence is only 'potentially useful,' a bad-faith showing

Simply put, where the evidence withheld or destroyed by the police falls into that more serious category, the defendant is not required to make any further showing regarding the mental state of the police. *See Wright*, 260 F.3d at 573 (Gilman, J., concurring) ("Thus, the first part of the *Jobson* test — good or bad faith — should be irrelevant once the last two parts of the *Jobson* test are shown, because the Supreme Court has expressly held that the determination of good or bad faith is irrelevant for materially exculpatory evidence."). As the Court explained in *Youngblood*, "[t]he presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Id.* at 56 n.*.

By overlooking this critical distinction, the concurrence misinterprets the nature of the due process inquiry required under these circumstances. In *Trombetta*, the Supreme Court suggested, as explained above, that government "authorities" run afoul of the Constitution when they make "a calculated effort to circumvent the disclosure requirements established by *Brady v. Maryland* and its progeny." 467 U.S. at 488. The Court also observed in that case that "[t]he record contains no allegation of official animus towards respondents or of a conscious effort to suppress exculpatory evidence." *Id.* Emphasizing these scattered statements, the concurrence argues that a § 1983 plaintiff asserting *any* due process claim against the police is required to demonstrate bad faith. If the concurrence means by "bad faith" anything more than that the police were aware of the exculpatory value of the evidence at issue, however, then we respectfully disagree.

---

is required." *Id.* at 56 (citing *United States v. Moore*, 452 F.3d 382, 388 (5th Cir. 2006) ("impermissibly withheld evidence must be either (1) material and exculpatory or (2) only potentially useful, in combination with a showing of bad faith on the part of the government"); *United States v. Estrada*, 453 F.3d 1208, 1212-13 (9th Cir. 2006) (only requiring a showing of bad faith when the evidence is "potentially exculpatory, as opposed to apparently exculpatory"); *Bullock v. Carver*, 297 F.3d 1036, 1056 (10th Cir. 2002) ("A defendant can obtain relief under the Due Process Clause when he can show that a police department destroyed evidence with 'an exculpatory value that was apparent before [it] was destroyed.' . . . Where, however, the police only failed to preserve 'potentially useful' evidence that might have been exculpatory, a defendant must prove that the police acted in bad faith by destroying the evidence." (internal citations omitted)). Although the decisions of the Fifth, Ninth, and Tenth Circuits are not binding, they lend strong support to our interpretation of this passage from *Youngblood*.

What the concurrence overlooks is that *Trombetta* involved evidence that was only potentially useful to the defense, not evidence that was demonstrably exculpatory.[13] *Id.* at 489 (concluding that the evidence in question did not satisfy the "materiality" requirement because its "exculpatory value" was not "apparent before the evidence was destroyed"); *see also Youngblood*, 488 U.S. at 60 (Stevens, J., concurring) ("In *Trombetta*, this Court found no due process violation because 'the chances [were] extremely low that preserved [breath] samples would have been exculpatory.'" (quoting *Trombetta*, 467 U.S. at 489) (alterations in original)). In fact, the Court's decision in *Trombetta* even makes clear that the "constitutional materiality" of the withheld evidence simply is "more important[]" than whether the police acted in good or bad faith. 467 U.S. at 488; *see also Youngblood*, 488 U.S. at 65 (Blackmun, J., dissenting) ("The determination in *Trombetta* that the prosecution acted in good faith and according to normal practice merely prefaced the primary inquiry, which centers on the 'constitutional materiality' of the evidence itself.").

The policy risks imagined by the concurrence also stem from this fundamental misunderstanding of the "absolute" nature of the *Brady* obligation.[14] In *Bagley*, the Court explained that "the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." 473 U.S. at 675; *see also Agurs*, 427 U.S. at 108 ("But to reiterate a critical point, the prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial."). In other words, the Due Process Clause imposes

---

[13] Even the decisions from the Eighth Circuit on which the concurrence relies involved evidence that was only potentially useful. *See White*, 519 F.3d at 814 ("*Brady*'s protections also extend to actions of other law enforcement officers such as investigating officers. However, an investigating officer's failure to preserve evidence potentially useful to the accused or their [sic] failure to disclose such evidence does not constitute a denial of due process in the absence of bad faith."); *Villasana*, 368 F.3d at 979 (observing that the documents at issue "had neither exculpatory nor impeachment value").

[14] We also are highly skeptical of the concurrence's dire warnings that rejecting the bad-faith standard in this context will increase significantly the number of lawsuits against the police given that this circuit already has rejected the notion that bad faith is required to assert other due process claims against the police, including claims alleging that the police failed to preserve material exculpatory evidence. *See Branch*, 537 F.3d at 589; *Wright*, 260 F.3d at 570.

an "absolute duty" on the prosecutor only with regard to certain evidence, *i.e.* "material exculpatory evidence."  *See Youngblood*, 488 U.S. at 57.

The central lesson of all of these cases is that the critical factor in determining whether the state's obligation is "absolute" turns on the nature of the evidence at issue, not who destroyed or suppressed the evidence.  The justification for imposing an absolute duty where material and exculpatory evidence is at issue is clear enough:  the failure to preserve or disclose such evidence directly threatens the "fundamental fairness" of a defendant's criminal trial.  *See Youngblood*, 488 U.S. at 58; *Trombetta*, 467 U.S. at 485; *Lisenba*, 314 U.S. at 236.  Because that concern for fundamental fairness is just as strong where a defendant claims that the police destroyed or suppressed material evidence, *see Branch*, 537 F.3d at 589, there is no constitutionally-supportable basis for applying a different standard and requiring courts to inquire into the mental state of the police.

The only difference in the requisite inquiry is that, where the police are concerned, the "exculpatory value" of the evidence must be "apparent."[15]  *Trombetta*, 467 U.S. at 489.  This additional burden, however, merely reflects that materiality is a legal question that the police are not trained to make, and thereby accounts for the practical concern that the police cannot be held accountable for failing to divine the materiality of every possible scrap of evidence.[16]  *See Youngblood*, 488 U.S. at 58.  It

---

[15]In *Youngblood*, the Court suggested that this additional burden was satisfied where "the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." 488 U.S. at 58.

[16]To whatever limited extent our colleague's policy concerns are justified, we think that the ultimate result is not that the police will be held liable under § 1983 more often, but rather that the police simply will opt to turn over more information to the prosecutor's office in an attempt to minimize their potential exposure to such suits. *See Agurs*, 427 U.S. at 108 ("Because we are dealing with an inevitably imprecise standard, and because the significance of an item of evidence can seldom be predicted accurately until the entire record is complete, the prudent prosecutor will resolve doubtful questions in favor of disclosure.").  Although policy considerations do not factor into our decision, we note that this is an outcome that should be encouraged given that prosecutors, *not the police*, should be making the decision about what evidence must be disclosed to the defense. *See United States v. Leon*, 468 U.S. 897, 900-901 (1984) (recognizing overarching "goal" of establishing "procedures under which criminal defendants are 'acquitted or convicted on the basis of all the evidence which exposes the truth'" (quoting *Alderman v. United States*, 394 U.S. 165, 175 (1969)).  After considering both perspectives, we conclude that the policy considerations favor our approach because providing prosecutors a fuller picture of the evidence in any given case will allow them to make more informed decisions about whether to disclose or withhold a particular piece of evidence, which undoubtedly is a goal that should be encouraged. *See Kyles*, 514 U.S. at 439 ("This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose

does not imply, however, that the police are entirely shielded from liability unless a defendant shows "bad faith." Where the exculpatory value of a piece of evidence is "apparent," the police have an *unwavering* constitutional duty to preserve and ultimately disclose that evidence.[17] The failure to fulfill that obligation constitutes a due process violation, regardless of the whether a criminal defendant or § 1983 plaintiff can show that the evidence was destroyed or concealed in "bad faith." The reason no *further* showing of animus or bad faith is required is that, where the police have in their possession evidence that they know or should know "might be expected to play a significant role in the suspect's defense," *Trombetta*, 467 U.S. at 488, the destruction or concealment of that evidence can *never* be done "in good faith and in accord with their normal practice," *Killian v. United States*, 368 U.S. 231, 242 (1961). Consequently, requiring a criminal defendant or § 1983 plaintiff to show a "conscious" or "calculated" effort to suppress such evidence would be superfluous.[18]

In any event, even if we were inclined to believe that bad faith was required, we still would not conclude that Detective Ingles is entitled to summary judgment. Because we must read the record in the light most favorable to Moldowan, we conclude that Burroughs' testimony, taken as a whole, provides sufficient evidence for Moldowan's claims to survive summary judgment because a jury could reasonably conclude that Detective Ingles acted in bad faith. Although there is no direct evidence that Detective

---

a favorable piece of evidence. This is as it should be." (citation omitted)).

[17]Contrary to the concurrence's dire predictions, imposing this obligation on the police does not create a significant, or even additional, burden. On the contrary, the Court already has concluded that it is reasonable to expect that the police can recognize and preserve evidence that "might be expected to play a significant role in the suspect's defense." *Trombetta*, 467 U.S. at 488. Asking the police simply to disclose that same evidence to the prosecutor is no great burden.

[18]Nor is there any justification for imposing a higher burden because Moldowan asserts his due process claim in the § 1983 context. *See Parratt v. Taylor*, 451 U.S. 527, 534 (1981) ("Nothing in the language of § 1983 . . . limits the statute solely to intentional deprivations of constitutional rights."); *see also id.* at 535 ("[Section] 1983 affords a civil remedy for deprivations of federally protected rights . . . without any express requirement of a particular state of mind."). Although the Court's decision in *Daniels* overruled other aspects of *Parratt*, it expressly left undisturbed *Parratt*'s holding as to § 1983. *See Daniels*, 474 U.S. at 329-30 ("In *Parratt v. Taylor*, we granted certiorari . . . to decide whether mere negligence will support a claim for relief under § 1983. . . . We concluded that § 1983, unlike its criminal counterpart, 18 U.S.C. § 242, contains no state-of-mind requirement independent of that necessary to state a violation of the underlying constitutional right. We adhere to that conclusion." (internal quotations and citations omitted)).

Ingles acted intentionally in withholding these exculpatory statements, Burroughs' testimony, at least when viewed in the light most favorable to Moldowan, provides sufficient evidence for Moldowan's claim to survive summary judgment. Despite Detective Ingles' insistence to the contrary, we lack the jurisdiction to consider his claim that Burroughs never made any such statements to the police. *See Gregory*, 444 F.3d at 744-45 ("By arguing that the evidence establishes at most a negligent performance of her duties, [defendant] is arguing disputed issues of fact to this Court. We cannot entertain [defendant's] arguments going to disputed issues of material fact on this interlocutory appeal.").

Detective Ingles also suggests that Moldowan cannot prevail on his *Brady* claims because he cannot demonstrate prejudice. *See Strickler*, 527 U.S. 263, 281 (1999) ("[S]trictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."). That issue, however, also involves disputed issues of fact which are beyond our reach at this juncture. *Johnson*, 515 U.S. at 313-18; *Gregory*, 444 F.3d at 744.

### 2. Counts XIII, XIV, and XV — Perjury (Ingles)

Moldowan also asserts claims against Detective Ingles under the Fifth, Sixth, and Fourteenth Amendments based on Moldowan's allegation that, during the first trial, Ingles "committed perjury by testifying that he had prepared statements regarding any evidence that was relevant to the case, when, in fact, he had failed to reduce Mr. Burroughs['] exculpatory statement to a written report." (J.A. 293.) Detective Ingles responds that he is entitled to absolute immunity for any testimony he offered at trial. We agree.

Although government officials enjoy only qualified immunity as to their pretrial conduct, "all witnesses — police officers as well as lay witness — are absolutely immune from civil liability based on their trial testimony in judicial proceedings." *Briscoe*, 460 U.S. at 328. A witness is entitled to testimonial immunity "no matter how egregious or perjurious that testimony was alleged to have been." *Spurlock*, 167 F.3d

at 1001. Moreover, "the mere fact that plaintiffs may allege a conspiracy to render false testimony, as opposed to simply alleging that one person testified falsely at trial, does not waive absolute testimonial immunity." *Id.*  Accordingly, Detective Ingles is entitled to absolute immunity for the testimony he offered at trial. That protection, however, does not extend to Ingles' non-testimonial conduct, "despite any connection these acts might have to later testimony." *Gregory*, 444 F.3d at 739.

In his complaint, as well before this Court, Moldowan asserts that Detective Ingles cannot assert absolute testimonial immunity because he is the "complaining witness." Although there is a well-established exception to the doctrine of absolute testimonial immunity "insofar as [an official] performed the function of a complaining witness," *Kalina v. Fletcher*, 522 U.S. 118, 131 (1997); *see also Malley v. Briggs*, 475 U.S. 335, 340-41 (1986), that exception does not extend to testimony delivered at trial. *See Vakilian*, 335 F.3d at 516 (distinguishing between an officer's role as a "complaining witness" and a "testifying witness"); *Spurlock*, 167 F.3d at 1003-04 (distinguishing between testimonial and pre-trial conduct). As with any witness, police officers enjoy absolute immunity for any testimony delivered "at adversarial judicial proceedings." *Gregory*, 444 F.3d at 738.

Because Moldowan's perjury claims are based entirely on Detective Ingles' trial testimony rather than conduct related to his role as the "complaining witness," Ingles is entitled to absolute immunity. This is true regardless of whether he previously signed the arrest warrant as the complaining witness. Detective Ingles therefore is entitled to summary judgment as to Counts XIII, XIV, and XV.

### 3.  Count XXXI — Malicious Prosecution (Ingles)

In Count XXXI, Moldowan asserts a state law claim against Detective Ingles for malicious prosecution. Under Michigan law, in order to state a *prima facie* case of malicious prosecution, Moldowan "must prove: 1. Prior proceedings terminated in favor of the present plaintiff; 2. Absence of probable cause for those proceedings; 3. Malice, defined as a purpose other than that of securing the proper adjudication of the claim; and 4. A special injury that flows directly from the prior proceedings." *Payton v. City of*

*Detroit*, 536 N.W.2d 233, 242 (Mich. Ct. App. 1995) (citing *Young v. Motor City Apartments Ltd.*, 350 N.W.2d 790, 792 (Mich. Ct. App. 1984)).  Because Moldowan's 2003 re-trial obviously terminated in his favor, the first element is satisfied.

As to the issue of probable cause, consideration of that element generally involves factual disputes that extend beyond the scope of our jurisdiction on interlocutory appeal.  The Michigan Court of Appeals, however, has made clear that, as a matter of law, the "[f]ailure to include all exculpatory facts is not adequate to sustain a suit for malicious prosecution." *Payton*, 536 N.W.2d at 242.  Nevertheless, because "'[a]ctions for malicious prosecution are regarded by law with jealousy,'" *Roblyer v. Hoyt*, 72 N.W.2d 126, 128 (Mich. 1955) (quoting *Van Sant v. American Express Co.*, 158 F.2d 924, 931 (3d Cir. 1946)), Michigan courts have held that "'the only situation in which an action for malicious prosecution would properly lie is where a police officer knowingly swears to false facts in a complaint, without which there is no probable cause.'" *King v. Arbic*, 406 N.W.2d 852, 858 (Mich. Ct. App. 1987) (quoting *Belt v. Ritter*, 171 N.W.2d 581, 586 (Mich Ct. App. 1969)).

In asserting his malicious prosecution claim against Detective Ingles, Moldowan alleges only that Ingles "failed, as the complaining witness, to make a full and fair disclosure of the material facts and allowed the prosecution . . . to continue without probable cause." (J.A. 313.)  Although Moldowan makes a vague and conclusory allegation that the criminal complaint against him was "based on the . . . false evidence provided by Defendant Ingles," he never identifies any such "false evidence." (J.A. 314.)  Moldowan's only substantive allegation in support of this claim is that Detective Ingles "deliberately failed to convey [Burroughs' statements] to the Macomb County Prosecutor." (J.A. 313.)  Consequently, even accepting all of Moldowan's allegations as true, we conclude that, under *Payton*, a claim for malicious prosecution does not lie under these circumstances.

### 4.   Counts XXII and XXIII — Destruction of Evidence (Schultz)

In Counts XXII and XXIII, Moldowan asserts statutory and constitutional claims against Officer Schultz based on the destruction of evidence introduced at Moldowan's first trial.  It is undisputed that this evidence was destroyed in contravention of the trial court's explicit order that all such evidence was to be preserved "from this date forward until further order of the Circuit Court, Michigan Court of Appeals, or Michigan Supreme Court."  (J.A. 2613.)

In Count XXIII, Moldowan asserts a statutory claim under 18 U.S.C. § 1503. That provision, however, provides criminal penalties for obstruction of justice through corrupt conduct and threats of force; it does not provide a civil claim for monetary damages.  Nor does violation of that provision give rise to a claim for damages under 42 U.S.C. § 1983 because it does not contain explicit "rights-creating language." *Johnson v. City of Detroit*, 446 F.3d 614, 621 (6th Cir. 2006) (holding that "statutory language that merely 'benefits' putative plaintiffs without specific rights-creating language is insufficient to confer a personal federal right enforceable under § 1983" (citing *Gonzaga Univ. v. Doe*, 536 U.S. 273, 282 (2002))).   Accordingly, Officer Schultz is entitled to summary judgment as to Count XXIII.

Moldowan's constitutional claim in Count XXII, on the other hand, is a more involved question.  "To safeguard a defendant's due process right to present a complete defense, the Supreme Court has developed 'what might loosely be called the area of constitutionally guaranteed access to evidence.'"  *Wright*, 260 F.3d at 570 (quoting *Trombetta*, 467 U.S. at 485).  In *Trombetta*, for instance, the Supreme Court recognized that the Constitution may impose a duty on the state "to preserve evidence" where such evidence "might be expected to play a significant role in the suspect's defense."  467 U.S. at 488.

Defendants again argue that, even though *Trombetta* recognized that the failure to preserve evidence may give rise to a constitutional violation, summary judgment nevertheless is warranted because Moldowan cannot demonstrate bad faith on the part

of Officer Schultz.  In defining the contours of this "area of constitutionally guaranteed access to evidence," however, the Supreme Court has developed separate tests "to determine whether the government's failure to preserve evidence rises to the level of a due process violation in cases where material exculpatory evidence is not accessible, versus cases where [merely] 'potentially useful' evidence is not accessible." *Wright*, 260 F.3d at 570 (citations omitted).  As we explained above in regard to Moldowan's claims against Detective Ingles, *see supra* Part IV.C.1, the Supreme Court has recognized that the state violates a suspect's due process rights, regardless of the bad faith of the state actor, where material exculpatory evidence is not preserved.  *See Trombetta*, 467 U.S. at 489.  Accordingly, the more burdensome bad faith requirement does not apply where material exculpatory evidence was lost or destroyed.  *See Wright*, 260 F.3d at 571 ("The destruction of material exculpatory evidence violates due process regardless of whether the government acted in bad faith."); *see also Monzo v. Edwards*, 281 F.3d 568, 580 (6th Cir. 2002) (discussing bad faith requirement only in terms of potentially useful evidence).

In light of these distinct tests, Moldowan would need to demonstrate bad faith only if the evidence at issue is merely "potentially useful."  At this stage, however, we cannot resolve that disputed issue of fact.  *See Johnson*, 515 U.S. at 313-18; *Gregory*, 444 F.3d at 744-45.  Nevertheless, even assuming that the evidence at issue was materially exculpatory, Moldowan still would be required to show that the "exculpatory value" of the evidence was "apparent" before it was destroyed.  *Trombetta*, 467 U.S. at 489.

Although the record indicates that the materiality of this evidence was, or at least should have been, apparent to Detective Ingles and other investigating officers, there is no evidence in the record that Officer Schultz had any knowledge whatsoever about the nature of the evidence that he destroyed.  According to Officer Schultz's undisputed testimony, he was assigned the entirely ministerial task of sending out annual inquiries to the detectives in charge of each case, asking whether the detective wanted the evidence being held in the property room "held, destroyed or released."  Schultz testified

that he had no involvement in the Moldowan case, had no knowledge of what type of evidence was being held in the property room, and was not aware of the court order requiring that evidence from the first trial be preserved. Even read in the light most favorable to Moldowan, there simply is no evidence that Officer Schultz had any idea that the evidence he destroyed "could form a basis for exonerating the defendant." *Youngblood*, 488 U.S. at 58. We therefore reverse the district court's denial of summary judgment as to Count XXII.

### 5. Counts XXIV and XXVI — Municipal Liability (City of Warren)

Moldowan also asserts various claims against the City of Warren and the Warren Police Department. Because the district court dismissed the Department as a defendant and Moldowan did not appeal that ruling, only the City's susceptibility to suit is before us. In Count XXIV, Moldowan claims that the City is liable under § 1983 for failing to adequately train its police officers regarding the constitutional rights of criminal defendants. In Count XXVI, Moldowan claims that the City is liable because an unidentified individual with "policy-making authority" ordered the destruction of evidence in contravention of the trial court's order.

Because qualified immunity is unavailable in § 1983 claims against a municipality, *see Pearson*, 129 S. Ct. at 822 (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998)), the City instead argues that Moldowan cannot establish municipal liability on any of these claims because he cannot establish an underlying deprivation of a constitutional right. As explained above, however, we find that Moldowan's failure-to-disclose claims against Detective Ingles do implicate clearly established due process rights. Moreover, "[t]he courts recognize a systematic failure to train police officers adequately as custom or policy which can lead to city liability." *Gregory*, 444 F.3d at 753 (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). This Court consistently has recognized that a plaintiff may establish municipal liability by showing "a policy of inadequate training or supervision," including "a policy of tolerating federal rights violations [that] is unwritten but nevertheless entrenched." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citing *Doe v.*

*Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996)).  In light of this controlling authority, we conclude that Moldowan's allegations, when taken as true, sufficiently establish that the City's alleged failure to adequately train its officers potentially violated his constitutional rights.  As the Supreme Court consistently has recognized, "a city can be liable under § 1983 for inadequate training of its employees."  *Harris*, 489 U.S. at 388.

In discussing the "failure-to-train" theory of municipal liability, the Supreme Court explained in *Harris* that "the focus must be on [the] adequacy of the training program in relation to the tasks the particular officers must perform."  *Id.* at 390.  Although *Harris* involved a city's failure to train its officers to determine whether a detainee required medical care, the Supreme Court spoke more broadly, noting that "it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  *Id.*  The Court noted that this theory of liability is an issue "on which the Courts of Appeals have all agreed," collecting cases in a broad array of areas.  *Id.* at 388 & n.6.

Because we already have determined that the police have a duty to preserve and turn over to the prosecutor evidence that the police recognize as having exculpatory value or where the exculpatory value of the evidence is apparent, *Harris* dictates that the City has a corresponding obligation to adequately train its officers in that regard.[19]  *See id.* at 390 (recognizing that a city may be liable for failing to provide adequate training "in light of the duties assigned to specific officers or employees"); *Brady*, 187 F.3d at 114 (noting that properly handling exculpatory evidence is a "standard police function").

As to Count XXVI, we also must determine whether Moldowan can establish municipal liability based on the decisions an unidentified "individual having final

---

[19]The City also argues that the record does not support § 1983 liability in this case because, unlike *Gregory*, the City introduced evidence demonstrating that it has developed and implemented adequate training for its officers. Moldowan disputes the adequacy of this effort. Resolving such disputed factual issues is beyond the scope of this interlocutory appeal.

policy-making authority."**20**  In *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court held that local government units could be held liable under § 1983 for deprivations of federal rights, but concluded that § 1983 did not support *respondeat superior* liability, reasoning that "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."  *Id.* at 691.  In *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) (plurality opinion), however, the Court clarified that this "official policy" requirement did not preclude municipal liability "for a single decision by municipal policymakers under appropriate circumstances."  *Id.* at 480.

Although *Pembaur* recognized policy-maker liability, the Court made clear that "not every decision by municipal officers automatically subjects the municipality to § 1983 liability."  *Id.* at 482.  Rather, municipal liability "attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered."  *Id.*  In other words, the official must be "responsible for establishing final government policy respecting such activity before the municipality can be held liable."  *Id.* at 483.

Under *Pembaur*, therefore, the City may be held liable under § 1983 for the failure to disclose exculpatory evidence and the destruction of evidence from Moldowan's first trial, even though those actions were not taken pursuant to an overarching policy.  And, contrary to Defendants' assertions, municipal "policymaker" liability has been clearly established at least since *Pembaur* was decided in 1986.**21**

---

**20**Defendants vigorously argue that, even taking all of his allegations as true, Moldowan will not be able to prevail on Count XXVI.  This argument does have some appeal.  Despite extensive discovery, Moldowan has yet to identify the individual responsible for ordering the destruction of evidence.  Moldowan also has not introduced any evidence of an official policy directing officers to withhold exculpatory evidence from the prosecutor.  Nor has he alleged a "clear and persistent pattern" of such conduct.  *See Doe*, 103 F.3d at 508.  In fact, the City points to deposition testimony  and sworn statements suggesting that no such pattern or custom exists.  Nevertheless, whether Moldowan has alleged facts sufficient to satisfy the elements of a claim for municipal liability is beyond the scope of this interlocutory appeal.  The evidence on which Defendants rely does not, as did the record evidence before the Supreme Court in *Scott*, "so utterly discredit[]" Moldowan's assertions such that "no reasonable jury could have believed him."  550 U.S. at 380.

**21**We also disagree with the notion that Moldowan cannot make out a claim against the City under Count XXVI because he cannot show any constitutional violation on the part of Officer Schultz.  Although Officer Schultz did not violate Moldowan's constitutional rights by destroying the case evidence,

Because we conclude that Moldowan's claims against the City are based on claims that implicate clearly established constitutional rights, we affirm the district court's denial of summary judgment as to these claims.

### 6.  Counts V-VIII, XVI-XIX, and XXXIV — Conspiracy Claims

Moldowan's Third Amended Complaint also asserts numerous claims alleging that the Defendants, in various ways, conspired together to violate his constitutional rights. Moldowan's conspiracy claims are asserted against Defendants Ingles, Fournier, and Dr. Warnick acting in concert together as well as with unnamed members of the Warren Police Department and the Macomb County Prosecutor's Office.

In this circuit, "[i]t is well-settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under § 1983." *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987). After reviewing each of Moldowan's conspiracy claims, it is evident that he has failed to plead these claims with the requisite specificity. In Count V, for instance, Moldowan merely asserts that Dr. Warnick and Detective Ingles, along with other unnamed members of the Warren Police Department, "conspired together for the illegal purpose of violating [his] civil rights." (J.A. 287.) To support that claim, Moldowan offers only one substantive factual allegation, that "Defendants . . . arrang[ed] for the photographing of the bite marks on Ms. Fournier and for making molds of Mr. Moldowan's and Mr. Cristini's dentition." (J.A. 287.) Moldowan makes no other allegations of acts taken in furtherance of a conspiracy. Without offering any further allegations, Moldowan then incorporates these "prior allegations" in Counts VI-VIII, serially recasting this claim as different constitutional violations. Moldowan takes the same approach in all of his other conspiracy claims, offering nothing more than one conclusory allegation in his first claim in the series, and then repeatedly recasting that allegation as different constitutional violations.

---

Moldowan nevertheless may be able to show that "the individual with final policy-making authority who directed . . . the destruction of the evidence" was aware of the materiality of the evidence, and thus did violate Moldowan's rights under *Trombetta* and *Youngblood*. Thus, at this stage at least, we are not inclined to grant summary judgment on that basis.

As in *Gutierrez*, a review of the allegations contained in Moldowan's various conspiracy claims evinces that "they are insufficient to withstand a motion for summary judgment [because they] . . . lack the requisite material facts and specificity necessary to sustain a conspiracy claim." 826 F.2d at 1539; *see also Jaco v. Bloechle*, 739 F.2d 239, 245 (6th Cir. 1984) (affirming dismissal of conspiracy claim where "complaint merely alleged broad conclusory negligence language void of the factual allegations necessary to support a conspiracy theory"). Accordingly, summary judgment is appropriate as to each of Moldowan's nine conspiracy claims. *See Spadafore v. Gardner*, 330 F.3d 849, 853-54 (6th Cir. 2003).

### 7. Count XXXV — False Imprisonment

In Count XXXV, Moldowan asserts a claim against the City of Warren for false imprisonment and continued seizure without probable cause under the Fourth Amendment. Specifically, Moldowan alleges that, after the Michigan Supreme Court reversed his conviction in 2002, there no longer was "probable cause to believe that [he] had committed the criminal acts that Defendant Fournier accused him of," and thus, "[b]y virtue of being held under house arrest without probable cause," he was "unlawfully restrained." (J.A. 319-20.)

In *Spurlock*, this Court held that plaintiffs asserted claims that alleged violations of established constitutional rights by alleging that "defendants wrongfully investigated, prosecuted, convicted and incarcerated them; that [a defendant police officer] fabricated evidence and manufactured probable cause; [and] that they were held in custody, despite a lack of probable cause to do so." 167 F.3d at 1005. *Spurlock* also held that the rights in question were clearly established by at least April of 1990, the date of the alleged conduct in that case. *Id.* at 998-99. Under *Spurlock*, then, Moldowan's nearly identical allegations also must implicate clearly established constitutional right. This conclusion is not affected by the trial court's determination, prior to Moldowan's first trial, that probable cause existed. *See Hinchman v. Moore*, 312 F.3d 198, 202-03 (6th Cir. 2002) ("[A] finding of probable cause in a prior criminal proceeding does not bar a plaintiff in a subsequent civil action from maintaining a claim for malicious prosecution under

Michigan law where the claim is based on a police officer's supplying false information to establish probable cause." (citing *Darrah v. City of Oak Park*, 255 F.3d 301, 311 (6th Cir. 2001))).

Nor are we persuaded by Defendants' arguments that we can or should resolve the disputed factual issues underlying the probable cause determination. Whether probable cause existed to support the decision to arrest and detain a suspect generally is a question of law that may be reviewed *de novo* by this Court. *See United States v. Combs*, 369 F.3d 925, 937 (6th Cir. 2004) (citing *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999)). Because of the posture of this appeal, however, we cannot consider the disputed factual issues underlying Moldowan's claim that there was a want of probable cause. *See Johnson*, 515 U.S. at 313-18; *Gregory*, 444 F.3d at 743-44. We thus affirm the district court's denial of summary judgment as to this claim.

## V.

Next we turn to the claims raised by Dr. Warnick's appeal (Case No. 07-2116). Dr. Warnick is the forensic odontologist who testified that, in his expert opinion, the bite-mark evidence conclusively linked Moldowan to the attack. Dr. Warnick's testimony undoubtedly played a major role in Moldowan's conviction as it confirmed Fournier's testimony that Moldowan was one of her assailants. Moldowan asserts various claims against Dr. Warnick. Each of these claims is considered in turn.

**A.  Counts I-IV — Fabricating Evidence and Withholding Exculpatory Evidence**

In Counts I-IV, Moldowan asserts violations of his rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments, alleging that Dr. Warnick, "either intentionally or with deliberate indifference and/or with reckless disregard of the truth and of [Moldowan's] constitutional rights, fabricated evidence and withheld impeaching and exculpatory evidence from the Macomb County Prosecutor and from [Moldowan's] defense counsel." (J.A. 284.) In response, Dr. Warnick argues that he is entitled to summary judgment on these claims because Moldowan's complaint failed to identify the allegedly unconstitutional conduct. Dr. Warnick's argument is not well taken.

Qualified immunity shields government officials acting within the scope of their official duties from civil liability insofar as their conduct does not violate clearly established rights. *See Harlow*, 457 U.S. at 817-18. In clarifying the scope of the qualified immunity inquiry, the Supreme Court stated in *Mitchell* :

> An appellate court reviewing the denial of the defendant's claim of immunity need not consider the correctness of the plaintiff's version of the facts, *nor even determine whether the plaintiff's allegations actually state a claim.* All it need determine is a question of law: whether the *legal norms* allegedly violated by the defendant were clearly established at the time of the challenged actions or, in cases where the district court has denied summary judgment for the defendant on the ground that even under the defendant's version of the facts the defendant's conduct violated clearly established law, whether the law clearly proscribed the actions the defendant claims he took.

472 U.S. at 528 (emphasis added). Accordingly, we need not determine at this stage whether Moldowan's complaint states a claim on which relief may be granted, but only whether, assuming the facts as asserted by Moldowan, the "legal norms allegedly violated by the defendant were clearly established at the time of the challenged action." *Id.*

In *Gregory*, we reasoned that expert forensic examiners "act in an investigatory fashion when they interpret and document physical evidence," and thus we determined that "the intentional fabrication of a forensic report" is subject to the same considerations applied to the intentional fabrication of evidence by a police officer or prosecutor. 444 F.3d at 740. Under that framework, *Gregory* concluded that a forensic expert may be subject to suit under § 1983 for deliberately withholding the existence of exculpatory forensic evidence or fabricating forensic evidence. *Id.* at 744. Relying on *Spurlock*, *Gregory* reaffirmed that a forensic expert defendant "'cannot seriously contend that a reasonable [investigator] would not know that such actions were inappropriate and performed in violation of an individual's constitutional . . . rights.'"[22]  *Id.* at 744

---

[22]Contrary to Defendants' suggestion, the fact that Dr. Warnick subsequently testified as to these issues does not insulate him from liability. As we made clear in *Gregory*, absolute testimonial immunity does not "relate backwards" to protect a defendant for any activities he allegedly engaged in prior to taking the witness stand. 444 F.3d at 738-39 ("Subsequent testimony can not insulate previous fabrications of evidence merely because the testimony relies on that fabricated evidence.").

(quoting *Spurlock*, 167 F.3d at 1005) (alteration in *Gregory*).  *Gregory*'s reliance on *Spurlock* is significant because we determined in that case that this legal norm was clearly established at least as early as April or May of 1990.  167 F.3d at 998-99, 1006.

Taking Moldowan's allegations that Dr. Warnick fabricated and manipulated evidence as true, we conclude that Counts I-IV assert violations of a clearly established legal norm.  We thus affirm the district court's denial of summary judgment as to these claims.

### B.   Count XXXIII — Gross Negligence

In Count XXXIII, Moldowan asserts a claim of gross negligence under state law. Under Michigan law, Dr. Warnick enjoys statutory immunity from liability to the extent that his conduct was within the scope of his duties as the State's forensic expert.  M.C.L. § 691.1407(2).  Because Dr. Warnick's conduct plainly falls within the scope of his duties, Moldowan must demonstrate that Dr. Warnick's conduct rises to the level of "gross negligence."  *See Payton*, 536 N.W.2d at 242.  Gross negligence is defined by statute as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results."  M.C.L. § 691.1407(7)(a); *see also Tallman v. Markstrom*, 446 N.W.2d 618 (Mich. 1989).  Whether Dr. Warnick's alleged conduct was sufficiently reckless, however, is a question of fact that is beyond the scope of this Court's jurisdiction, and thus that disputed issue of fact precludes summary judgment.

In addition, Moldowan also argues that Dr. Warnick *intentionally* withheld exculpatory evidence and fabricated evidence to support his conclusions.  Because "the immunity provided by MCL 691.1407(2) does not apply to an intentional tort by an individual governmental employee," *Walsh v. Taylor*, 689 N.W.2d 506, 510 (Mich. Ct. App. 2004), that provision cannot provide a basis for summary judgment because we must presume the veracity of Moldowan's allegations.  Accordingly, we affirm the district court's denial of summary judgment as to Count XXXIII.

## VI.

Finally, we address whether Fournier is entitled to immunity as to the various claims Moldowan asserts against her (Case No, 07-2117).

### A.  Absolute Testimonial Immunity

As an initial matter, we note that, to the extent that Moldowan's claims against Fournier rely on allegations that she offered perjured testimony at trial, Fournier is entitled to absolute immunity.  *Briscoe*, 460 U.S. at 345.  Fournier is entitled to immunity regardless of whether she conspired to deliver false or incomplete testimony. *See Alioto v. City of Shevely*, 835 F.2d 1173, 1174 (6th Cir. 1987) ("The doctrine enunciated in *Briscoe v. LaHue* also shields from liability alleged conspiracies to give false and incomplete testimony in judicial proceedings.").

Moldowan argues that Fournier is not entitled to testimonial immunity under *Briscoe* because she was the "complaining witness."  As noted above, the Supreme Court has excluded from the scope of protections offered by the doctrine of absolute immunity any conduct taken as the "complaining witnesses," such as where a police officer submits a false affidavit in support of an arrest warrant application.  *See Malley*, 475 U.S. at 340-41.  The record, however, plainly shows that Detective Ingles, *not Fournier*, functioned as the complaining witness in submitting the August 14, 1990 criminal complaint against Moldowan.[23] (J.A. 2238.)  The criminal complaint identifies Fournier only as the "victim or complainant."  (J.A. 2238.)

This is no mere formal distinction.  Fournier did not submit an affidavit to secure the arrest warrant, nor did she take any other actions to initiate Moldowan's arrest or prosecution that courts previously have found critical in applying the complaining witness exception.  Although Fournier's identification of Moldowan as one of her attackers certainly was critical to Detective Ingles' decision to file a criminal complaint

---

[23]In fact, Moldowan's Third Amended Complaint explicitly acknowledges that "Defendant Ingles signed [the] Complaint as the complaining witness charging Jeffrey Moldowan with four felonies." (J.A. 275.)

against Moldowan and the Macomb County Prosecutor's decision to pursue Moldowan's prosecution, her statements were only part of a broader, independent investigation. As the record shows, the police also were led to Moldowan by statements from Fournier's sister, Moldowan's prior arrests, and other evidence. In fact, Detective Ingles testified that he did not speak to Fournier until two days after the assault, during which time his investigation proceeded without her assistance. By the time Detective Ingles interviewed Fournier, he already had identified Moldowan as a likely suspect.

Given Fournier's limited role leading up to Moldowan's arrest, and in light of the independent inquiry conducted by the police, extending the complaining witness exception to Fournier in this case would run counter to the *functional* analysis we must apply in this context. *See Holloway v. Brush*, 220 F.3d 767, 774 (6th Cir. 2000) ("Absolute immunity is determined by a functional analysis that looks to 'the nature of the function performed, not the identity of the actor who performed it.'" (quoting *Buckley*, 509 U.S. at 269)).

### B.   Count XVI-XIX — § 1983 Conspiracy Claims

In Counts XVI-XIX, Moldowan asserts claims under § 1983 against Fournier, a private citizen, alleging that she conspired to violate his Fourth, Fifth, Sixth, and Fourteenth Amendment rights by fabricating evidence or withholding exculpatory evidence. In addition to being inadequately pled, *see supra* Part IV.C.6, we also hold that Moldowan cannot maintain an action under § 1983 against Fournier because she is not a "state actor" and did not act "under color of law." *See Tahfs v. Proctor*, 316 F.3d 584, 590 (6th Cir. 2003) ("A plaintiff may not proceed under § 1983 against a private party 'no matter how discriminatory or wrongful' the party's conduct." (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999))).

This circuit recognizes three tests for determining whether private conduct is fairly attributable to the state: the public function test, the state compulsion test, and the nexus test.

> The public function test "requires that the private entity exercise powers which are traditionally exclusively reserved to the state . . . ." The typical examples are running elections or eminent domain. The state compulsion test requires proof that the state significantly encouraged or somehow coerced the private party, either overtly or covertly, to take a particular action so that the choice is really that of the state. Finally, the nexus test requires a sufficiently close relationship (*i.e.* through state regulation or contract) between the state and the private actor so that the action may be attributed to the state.

*Ellison v. Garbarino*, 48 F.3d 192, 195 (6th Cir. 1995) (citations omitted). Moldowan offers no basis for concluding that any of these tests applies here. Providing information to the police, responding to questions about a crime, and offering witness testimony at a criminal trial does not expose a private individual to liability for actions taken "under color of law." *See Briscoe*, 460 U.S. 329 ("[Section] 1983 does not allow recovery of damages against a private party for testimony in a judicial proceeding."); *see also Benavidez v. Gunnell*, 722 F.2d 615, 618 (10th Cir. 1983) ("We know of no case in which the report of a state crime is action under color of state law under § 1983. The mere furnishing of information to police officers does not constitute joint action under color of state law which renders a private citizen liable under §§ 1983 or 1985.").

Fournier thus is entitled to summary judgment as to Counts XVI, XVII, XVIII, and XIX.

### C.  Count XXX — Malicious Prosecution

Moldowan also cannot sustain a claim for malicious prosecution against Fournier. Under Michigan law, a plaintiff may maintain a claim of malicious prosecution "against a private person" where the plaintiff offers "proof that the private person instituted or maintained the prosecution and that the prosecutor acted on the basis of information submitted by the private person that did not constitute probable cause." *Matthews v. Blue Cross & Blue Shield*, 572 N.W.2d 603, 610 (Mich. 1998). Michigan law, however, also recognizes that a criminal prosecution "is initiated in the sole discretion of the prosecutor." *Id.* at 605. This is critical because, as the Michigan Supreme Court explained in *Matthews*, the intervening and "independent exercise of

prosecutorial discretion establishes that the private defendant did not initiate the prosecution." *Id.* at 613. Thus, if the police or the prosecutor initiate the prosecution on the basis of evidence obtained through their own *independent investigation*, the complaining victim is insulated from liability. *Id.* at 613 n.28 ("'The exercise of the officer's discretion makes the initiation of the prosecution his own and protects from liability the person whose information or accusation has led the officer to initiate the proceedings.'" (quoting 3 Restatement Torts 2d § 653, cmt. g)). "Thus, in Michigan, the prosecutor's exercise of his independent discretion in initiating and maintaining a prosecution is a *complete defense* to an action for malicious prosecution." *Id.* at 613 (emphasis added).

That is precisely the case here. As noted above, although Fournier's identification of Moldowan as one of her attackers certainly was critical to the Macomb County Prosecutor's decision to prosecute him, her statements were only part of a broader, independent investigation. Under controlling Michigan authority, the exercise of independent judgment and discretion on the part of the police and the prosecutor precludes, as a matter of law, a malicious prosecution claim against Fournier.

**D. Count XXXVI— Intentional Infliction of Emotional Distress**

In Count XXXVI, Moldowan also asserts a state law intentional infliction of emotional distress claim against Fournier. According to the Third Amended Complaint, that claim rests on Fournier's alleged conduct "outside the courtroom with respect to the second prosecution." (J.A. 321.) But Fournier's role in the second prosecution was limited to testifying. There is nothing in the record to suggest that Fournier did anything "outside the courtroom" leading up to the second trial that would support Moldowan's claim. Accordingly, Fournier is entitled to absolute immunity as to Count XXXVI. *See Briscoe*, 460 U.S. at 342-45.

## VII.

For all of the reasons set forth above, we hereby: (1) hold that we have jurisdiction to consider Defendants' interlocutory appeals, and thus **DENY** each of Moldowan's motions to dismiss; (2) **REVERSE** the judgment of the district court and grant summary judgment as to Counts V, VI, VII, VIII, XVI, XVII, XVIII, XIX, and XXXIV on the ground that Moldowan failed to plead his conspiracy claims with the requisite specificity; (3) **REVERSE** the judgment of the district court and grant summary judgment as to Counts XIII, XIV, XV, XXII, and XXXVI on the ground that Defendants are entitled to immunity as to these claims; (4) **REVERSE** the judgment of the district court and grant summary judgment as to Counts XVI, XVII, XVIII, and XIX on the ground that § 1983 cannot support a claim against Fournier, a private individual, under these circumstances; (5) **REVERSE** the judgment of the district court and grant summary judgment as to Count XXIII on the ground that 18 U.S.C. § 1503 does not provide a private right of action and cannot support a civil claim for damages under § 1983; (6) **REVERSE** the judgment of the district court and grant summary judgment as to Count XXX on the ground that Michigan law does not support a claim for malicious prosecution against a victim complainant under these circumstances; (7) **REVERSE** the judgment of the district court and grant summary judgment as to Count XXXI on the ground that Michigan law does not support a claim for malicious prosecution against Detective Ingles under these circumstances; and (8) **AFFIRM** the judgment of the district court denying summary judgment as to Counts I, II, III, IV, IX, X, XI, XII, XXIV, XXVI, XXXIII, and XXXV on the ground that Moldowan's allegations implicate clearly established constitutional rights and disputed issues of fact preclude summary judgment.

---

**CONCURRING IN THE JUDGMENT IN PART, DISSENTING IN PART**

---

KETHLEDGE, Circuit Judge, concurring in the judgment in part, and dissenting in part. Moldowan puts many labels on his claims, but his claim against Officer Ingles is essentially that he should have disclosed, presumably to the prosecutor, the fact and contents of Jerry Burroughs' alleged statement to Ingles. I agree with the majority's conclusion that, under the standard of review applicable here, Moldowan is entitled to proceed with that claim. But I respectfully disagree with how the majority gets there.

I.

A.

With a significant caveat, the majority gets there by extending the no-fault regime of *Brady v. Maryland*, 373 U.S. 83 (1963)—or at least something functionally "analogous" to it, Maj. Op. at 26—to police officers. The caveat, as discussed below, may as a practical matter render insignificant the differences between the majority's approach and my own. I think it important, however, to explain why extending the *Brady* regime to police officers would be both unprecedented and unwise.

"The *Brady* doctrine imposes an absolute duty on the prosecutor to produce all materially favorable evidence in the State's possession." *Villasana v. Wilhoit*, 368 F.3d 976, 979 (8th Cir. 2004). By its terms, therefore, *Brady* applies to prosecutors, not police officers. *Brady* itself, of course, did not involve police conduct at all, but rather concerned a criminal defendant's attempt to obtain a new trial based upon the prosecution's suppression of evidence favorable to him. In granting Brady partial relief from his conviction, the Court held "that the suppression *by the prosecution* of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith *of the prosecution.*" 373 U.S. at 87 (emphasis added). Thus the *Brady* duty, as stated by the *Brady* Court, was imposed on the prosecutor; and in cases since, "[t]he Supreme Court

has never imposed this absolute duty on law enforcement officials other than the prosecutor." *Villasana*, 368 F.3d at 979; *see also Jean v. Collins*, 221 F.3d 656, 660 (4th Cir. 2000) (*en banc*) (Wilkinson, C.J., concurring in the judgment) ("The Supreme Court has always defined the *Brady* duty as one that rests with the prosecution") (collecting Supreme Court cases); *Lindsay v. Bogle*, 92 F. App'x 165, 170 (6th Cir. 2004) ("the *Brady* obligation applies only to prosecutors").

The imposition of that same absolute duty on police officers, therefore, would represent an extension of *Brady* that the Supreme Court itself has not made in the 46 years since it rendered the decision. I do not think the omission is fortuitous. Not only by its terms, but also by its content, the *Brady* duty is uniquely tailored to prosecutors. It applies to exculpatory evidence that is "material"; and the Supreme Court says that "[s]uch evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, *the result of the proceeding* [that is, the criminal trial] *would have been different*.'" *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Whether a particular piece of evidence would have changed the result of a criminal trial, of course, is a judgment that prosecutors, not police officers, are trained to make. The Eighth Circuit so observed in refusing to extend *Brady* to police officers:

> It is logical to impose *Brady*'s absolute duty on the government official who will present the State's case at trial [*i.e.*, the prosecutor], who can be expected to gather material evidence from law enforcement agencies, and who is in the best position to evaluate whether evidence must be disclosed because it is materially favorable to the defense.

*Villasana*, 368 F.3d at 979. And so too, in rejecting the same extension, did a plurality of the *en banc* Fourth Circuit:

> The *Brady* duty is framed by the dictates of the adversary system and the prosecution's legal role therein. Legal terms of art define its bounds and limits. The prosecutor must ask such lawyer's questions as whether an item of evidence has "exculpatory" or "impeachment" value and whether such evidence is "material." It would be inappropriate to charge police with answering these same questions, for their job of gathering evidence is quite different from the prosecution's task of evaluating it.

*Jean*, 221 F.3d at 660 (Wilkinson, C.J., concurring in the judgment).

The extension is also unnecessary. The *Brady* rule *already* "encompasses evidence 'known only to police investigators and not to the prosecutor.'" *Strickler*, 527 U.S. at 280-81 (quoting *Kyles v. Whitley*, 514 U.S. 419, 438 (1995)). But it is the prosecutor, not the police themselves, who bears an absolute duty to disclose it. Indeed, even as to evidence solely in police possession—which is the kind of evidence at issue here—the Supreme Court has specifically refused to impose the *Brady* duty directly upon the police, saying that to do so "would . . . amount to a serious change of course from the *Brady* line of cases." *Kyles*, 514 U.S. at 438. Instead, to comply with *Brady*, "*the individual prosecutor* has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Id.* at 437 (emphasis added). And any breach of that duty, no matter how diligent the prosecutor's efforts, entitles the criminal defendant to a new trial; "the prosecution's responsibility for failing to disclose known [even only to the police], favorable evidence rising to a material level of importance is inescapable." *Id.* at 438. Moreover, as discussed below, no one disputes that police officers already have an independent duty—though not a *Brady* duty—not to conceal materially exculpatory evidence in bad faith. Thus, as a practical matter, extending *Brady* to police officers would accomplish little with respect to the fairness of criminal trials that current law does not already accomplish.

What that extension would accomplish, rather, is a significant increase in lawsuits against police officers. Prosecutors enjoy absolute immunity for actions taken in their official capacities, *see Imbler v. Pachtman*, 424 U.S. 409, 413-16 (1976), whereas police officers do not. Police officers, therefore, would become the special object of attention from criminal defendants who believe that allegedly exculpatory evidence should have been, but was not, disclosed to their counsel prior to trial. And in this respect the police would present a large target. Police officers, particularly ones like Ingles who investigate violent crime in the field, obtain a great deal of information in the course of an investigation. Some of what they obtain, like shell casings, is tangible, but much of it, like things they may have seen or heard in the course of their activities, is

not.  As a practical matter, an officer cannot preserve, and thus pass on to the prosecutor, *everything* he sees, hears, or learns in the course of investigating a crime.  He instead has to exercise judgment about what seems important and what does not.  But if an officer bears an absolute duty to disclose materially exculpatory evidence, *all* of the information thus filtered by an officer's judgment, even in the purest good faith, potentially becomes the basis of a lawsuit against him.  An officer's failure to recognize an exculpatory clue, for example, and thus to pass it on to the prosecutor, would be a violation of the Due Process Clause.  That the officer was merely negligent, or even that no reasonable officer could have understood the clue's significance at the time, would be no defense; the *Brady* duty is absolute.  So if the clue could have changed the result of the criminal defendant's first trial, the defendant would not only get a second one; he would be entitled to have the officer pay him for his troubles as well.

This exposure would arise not only from evidence considered in isolation.  We must consider evidence *cumulatively* in determining whether it is materially exculpatory for purposes of *Brady*, *see Kyles*, 514 U.S. at 436, so an officer's failure to connect the exculpatory dots, as well, would render him liable for damages.  Two, or indeed any number of, pieces of information, that might have seemed unimportant to a reasonable investigator at the time, but that present an exculpatory picture after the fact when arranged just so, would be grounds for a suit.

Once unleashed, these suits would be very difficult to stop short of trial.  For in these cases the refuge of qualified immunity would be illusory.  Qualified immunity requires that the officer violate "clearly established" constitutional rights to be liable, with the idea being that, by definition, such liability is usually limited to officers who knew or should have known they were violating the law.  *See Saucier v. Katz*, 533 U.S. 194, 202 (2001).  But it does an officer little good to be aware of the *existence* of a generic duty, if, when acting in good faith and to the best of his ability, he is not aware that he is breaching it.  And because the *Brady* duty is absolute, a criminal-defendant-turned-plaintiff would need not prove that the officer knew—or even that any reasonable officer would have known—that the officer had a duty to disclose the particular

information at issue.  Foreknowledge of illegality would be beside the point; and thus, as a practical matter, qualified immunity would be no immunity at all.

B.

For good reason, then, no federal appellate court has extended *Brady*'s no-fault regime to police officers.   Two circuits have addressed the issue directly; and both of them pointedly refused to make the extension.  In *Porter v. White*, 483 F.3d 1294 (11th Cir. 2007), the court "h[e]ld that the no-fault standard of care *Brady* imposes on prosecutors in the criminal or habeas context has no place in a § 1983 damages action against a law enforcement official in which the plaintiff alleges a violation of due process." *Id*. at 1306.  The court thus concluded that "a negligent act or omission cannot provide a basis for liability in a § 1983 action seeking compensation for loss of liberty occasioned by a *Brady* violation." *Id*. at 1308.  And in *Villasana*, the Eighth Circuit held that a "bad faith standard should likewise apply to due process claims that law enforcement officers preserved evidence favorable to the defense but failed to disclose it."  368 F.3d at 980.

None of the cases that the majority cites actually imposes *Brady*'s absolute duty of disclosure upon police officers.  Most of them instead find liability for precisely the sort of bad-faith conduct that would give rise to liability under virtually any standard. *See, e.g.*, *Jones v. City of Chicago*, 856 F.2d 985, 995 (7th Cir. 1988) (finding liability for "retaining records in clandestine files deliberately concealed from prosecutors and defense counsel"); *Hart v. O'Brien*, 127 F.3d 424, 446 (5th Cir. 1997) (permitting a § 1983 claim "against a police officer who, after learning of patently exculpatory evidence, deliberately fails to disclose it to the prosecutor") (internal quotation marks omitted).

Nor do our own decisions in *Spurlock v. Satterfield*, 167 F.3d 995 (6th Cir. 1999), and *Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006), provide support for imposing such an absolute duty upon police officers.  *Spurlock* was not a failure-to-disclose case at all, but instead involved claims of fabricated evidence.  *See* 167 F.3d at 1005.  And we decided *Gregory* emphatically on *jurisdictional* grounds.  *See* 444 F.3d

at 743-44 (holding that, because the defendant officer's "*sole argument* with the district court's denial of qualified immunity goes to whether there exists a genuine issue of fact for trial . . . this Court lacks jurisdiction to entertain [the officer's] appeal from the district court's denial of qualified immunity for Plaintiff's claim of *Brady* violations") (emphasis added).

Still more revealing is Moldowan's heavy reliance—and to a lesser extent the majority's—on  our decision in *Hilliard v. Williams*, 516 F.2d 1344 (6th Cir. 1975), *vacated in part*, 424 U.S. 961 (1976).  The failure-to-disclose claim there was asserted against the defendant *prosecutor*, Williams, not the defendant police officer, Clark.  *See id*. at 1349 ("Williams withheld an F.B.I. report indicating that there was no blood on [plaintiff's] jacket").  The Supreme Court vacated our decision as to that claim on direct review.  The other claim in the case, against Officer Clark, was based upon his "deceptive and misleading *testimony*" at Hilliard's criminal trial.  *Id*. (emphasis added).  Which is to say, *Hilliard* was not a police-disclosure case at all.  Moreover, as to Clark, we thought "it plain that a law enforcement officer who knowingly gives evasive, misleading, and deceptive testimony during a criminal trial cannot escape civil liability[.]"  *Id*.  That holding too has since been invalidated by the Supreme Court.  *See Briscoe v. LaHue*, 460 U.S. 325, 328 (1983) ("all witnesses—police officers as well as lay witness—are absolutely immune from civil liability based on their trial testimony in judicial proceedings").  *Hilliard* is thus an empty husk of a decision, which did not present the issue before us in the first place, and which cannot possibly support extending *Brady* to police officers.

C.

1.

The issue before us today, as the majority correctly observes, is one of law rather than policy.  And I would decide it as such.  The standard that I would apply—and the one the Eighth and Eleventh Circuits apply—is the one that the Supreme Court has so far *always* applied to determine officer liability in the "area of constitutionally guaranteed access to evidence":  namely, bad faith.  *Arizona v. Youngblood*, 488 U.S.

51, 55 (1988) (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982)). This standard requires proof that the officer engaged in "a conscious effort to suppress exculpatory evidence." *California v. Trombetta*, 467 U.S. 479, 488 (1984). That requirement "both limits the extent of the police's obligation . . . to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.*, those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." *Youngblood*, 488 U.S. at 58.

Notwithstanding this plain language, the majority reads *Youngblood* to mean that no showing of bad faith is required to establish a violation of due process *by the police* "where 'material exculpatory evidence' is concerned[.]" Maj. Op. at 35. But *Youngblood* does not quite say that. What *Youngblood* says is that "[t]he Due Process Clause of the Fourteenth Amendment, *as interpreted in Brady*, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence." 488 U.S. at 57 (emphasis added). That statement does not impose an absolute duty upon police officers—as shown above, there *was* no police conduct at issue in *Brady*—but is instead merely a restatement of the *prosecutor's* absolute duty to disclose materially exculpatory evidence to the defendant. The evidence at issue in *Youngblood* was only "potentially" exculpatory, however, *id.* at 58, so it fell outside the scope of the prosecutor's absolute duty under *Brady*. The Court therefore considered whether the *police* had violated a duty "over and above" that imposed on the prosecutor, *id*. at 56, by failing to preserve that evidence. And the Court held that, to establish such a violation, Youngblood had to prove that the police destroyed the evidence in "bad faith[.]" *Id*. at 58.

But that holding does not mean that the police violate a defendant's due-process rights when, in the *absence* of bad faith, they fail to preserve or disclose materially exculpatory evidence. To the contrary, as the *Youngblood* Court's reiteration of the *Brady* duty makes clear, the failure to provide such evidence to the defendant would merely amount to a violation of the *prosecutor*'s absolute duty to disclose such evidence.

*See also Kyles*, 514 U.S. at 437 ("*the individual prosecutor* has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police") (emphasis added).  Nor does the Supreme Court's holding in *Trombetta* impose on police officers an absolute duty to preserve or disclose materially exculpatory evidence. Instead, the Supreme Court "rejected [Trombetta's] argument for several reasons[,]" the "first" of which was that "'the officers here were *acting in good faith and in accord with their normal practice*[.]'"  *Youngblood*, 488 U.S. at 56 (quoting *Trombetta*, 467 U.S. at 488) (emphasis added; internal quotation marks omitted).  That the *Youngblood* Court discussed the bad-faith standard in connection with potentially exculpatory evidence merely reflects the fact that, had the evidence there been materially exculpatory, there would have been no need to discuss police duties in the first place. Because in that event the *prosecutor* would have violated his duty under *Brady*.

2.

There remains the question whether Molodowan's claim against Ingles can proceed under *Youngblood*'s bad-faith standard.  That claim is based upon Ingles' failure to convey to the prosecutor the substance of Burroughs' statement to Ingles.  Two aspects of Burroughs' testimony, in my view, are critical.  First, he testified that he had personally heard two men—neither of whom was Moldowan—discussing Fournier's rape while standing outside the house next to his house.  That testimony, when viewed (as it must be) in the light most favorable to Moldowan, could be interpreted as meaning that the two men essentially admitted their involvement in the crime.  Second, Burroughs testified that he told "my story" to Ingles.  That reference, when viewed in that same light, could be understood to encompass *all* of Burroughs' story regarding the crime, including the two mens' admission on the sidewalk next door.  Thus, when viewed in the light most favorable to Moldowan, and as a whole, Burroughs' testimony could be read to mean that he told Ingles that two other men had essentially admitted to committing the crime Ingles was investigating.

There is no direct evidence that Ingles withheld Burroughs' statement in bad faith.  And I think courts should be wary of inferring bad faith from the mere fact of an

officer's failure to disclose evidence, lest the bad-faith standard become in practice an absolute one. But I think that, under the circumstances present here, a jury could infer bad faith from Ingles' failure to disclose Burroughs' statement—whose existence, to be fair, Ingles disputes—to the prosecutor. Of course, a jury would be free *not* to make that inference, in part because they might choose to understand Burroughs' testimony in a light less favorable to Moldowan, or not to believe it at all. Given our standard of review, however, we are not so free. I therefore agree that Moldowan is entitled to proceed with his claim against Ingles.

3.

As that bottom-line agreement suggests, my disagreement with the majority may prove larger in theory than in practice. To establish an officer's conscious suppression of materially exculpatory evidence—and thus his bad faith—a plaintiff must prove, among other things, "the police's knowledge of the exculpatory value of the evidence at the time" the criminal defendant says it should have been disclosed. *Youngblood*, 488 U.S. at 56 n. *. And therein lies the common ground between my approach and that of the majority. Notwithstanding its rather extended defense of imposing an absolute duty of disclosure upon police officers, and its rejection of a bad-faith standard in this context, and its declaration that "'*Brady* creates a singular constitutional duty, which prosecutors and police officers are capable of breaching in different ways[,]'" Maj. Op. at 28 (quoting *Jean*, 221 F.3d at 656 (Murnaghan, J., dissenting)), the majority, to its credit, does not simply extend *Brady*'s absolute duty of disclosure to police officers. The majority instead recognizes a "practical concern that the police cannot be held accountable for failing to divine the materiality of every possible scrap of evidence." Maj. Op. at 40. And the majority thus holds that a police officer does not breach his duty of disclosure unless the "'exculpatory value'" of the undisclosed evidence is "'apparent'" to him. Maj. Op. at 40 (quoting *Trombetta*, 467 U.S. at 489). When applying that rule to Moldowan's claim against Officer Schultz, the majority holds—and I agree—that Schultz was entitled to summary judgment because "there is no evidence

in the record" that he "had any knowledge whatsoever about the nature of the evidence that he destroyed." Maj. Op. at 46.

Thus, in the end, the majority extends *Brady*'s duty of absolute disclosure to police officers, but limits the scope of that duty to evidence whose materially exculpatory value was known to the particular officer sued. I think the better approach would be simply to apply the Supreme Court's bad-faith rule, rather than a modified version of an absolute rule designed for prosecutors. In practice, however, the latter rule will probably operate as the functional equivalent of the former.

### D.

With one exception, I otherwise concur in the majority's disposition of the remaining claims in the case. The exception concerns Count 26, in which Moldowan claims under § 1983 that the City is liable for Schultz's destruction of evidence. "A municipality . . . cannot be liable under § 1983 absent an underlying constitutional violation by its officers." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 900 (6th Cir. 2004). As discussed above, Schultz did not violate Moldowan's constitutional rights when he disposed of the evidence from Moldowan's first trial. The City therefore cannot be liable under § 1983 on this claim.

For these reasons, I concur partially in the judgment, and respectfully dissent in part.